[No. S007386. Mar. 30, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
SHAWN HILL, Defendant and Appellant.

802

804

COUNSEL

Paul J. Spiegelman, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Linda C. Johnson, Robert S. Henry, John R. Gorey and Kenneth C. Byrne, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WERDEGAR, J.**—Shawn Hill was convicted in 1988 in Los Angeles County Superior Court of the robbery and first degree murder of Stuart Margetts (Pen. Code, §§ 211, 187; all further statutory references are to this code unless otherwise stated), the attempted robbery and attempted second degree murder of Ronald Johnson (§§ 664/211, 664/187), and the robbery of Carrie Howard (§ 211). The jury also found true a robbery-murder special-circumstance allegation (former § 190.2, subd. (a)(17)(i), now see § 190.2, subd. (a)(17)(A)), as well as deadly weapon use enhancement allegations for all five substantive crimes (§ 12022, subd. (b)), and great bodily injury enhancement allegations for the four crimes other than the murder (§ 12022.7). The jury set the penalty at death under the 1978 death penalty law. (§ 190.1 et seq.) This appeal is automatic. (§ 1239, subd. (b).)

The facts of this case portray an individual engaged in the deadly game of selling "bunk," or bogus rock cocaine, to unsuspecting buyers. When the

prospective buyer discovers the scam and balks at completing the sale, he is stabbed in the chest. Although Ronald Johnson was severely injured, he survived this deadly assault. Stuart Margetts did not. Our review of the record, however, reveals that defendant's trial was rife with serious error. The most disturbing aspect of this case was the outrageous and pervasive misconduct on the part of the state's representative at trial: the public prosecutor. As we explain, although we might find any individual instance of prosecutorial misconduct or other error harmless standing alone, we cannot ignore the combined prejudicial effect these many missteps had on the overall fairness of the trial. Finding the cumulative prejudice flowing from the combination of prosecutorial misconduct and other errors rendered defendant's trial fundamentally unfair, we reverse the judgment in all respects.

FACTS

*Guilt Phase*

About 6:00 p.m. on August 25, 1986, Margetts told his girlfriend, Rita Berner, he was going out to buy some tools. Berner saw him take two $100 bills from a nightstand. He left in his blue Chevrolet S-10 truck. Shortly thereafter, Ceora (Mona) Williams, then 16 years old, was walking through the parking lot of the Pierce Apartments in the Pacoima section of Los Angeles, near the intersection of Pierce Street and Van Nuys Boulevard. Williams was on her way to play baseball; she met Reginald Berry on the way. She saw a blue Chevrolet pickup truck drive into the apartment house parking lot and pull into a space. A Black male walked over to the driver's side of the car and conversed with the driver, a White male. Williams testified the Black man was defendant, that she could see defendant's face "real well," and that she recognized him, having seen him in the parking lot off and on over the past few years.

Williams testified defendant had what appeared to be rock cocaine in his hand; he placed the other hand on top of the truck's cab while he spoke to the driver. She overheard the man in the truck ask, "Do you have a 50?" The driver was counting money, holding the bills in front of his chest. Williams saw defendant open a knife and hold it in his left hand on top of the truck cab. Defendant then looked at her and she became frightened, averting her eyes. When she looked back after about 10 seconds, defendant was gone and the driver of the truck began to drive away.

The truck did not get very far out of the parking lot, coming to rest just halfway down the block. Two women walked to the truck and placed the driver's head out of the window to "give him air." Williams and Berry

walked over to the truck and saw blood on the driver's shirt. The police were called; they determined the driver, Margetts, was dead from a single stab wound in the chest. No one saw anyone take anything from the truck. With the exception of a foreign dollar bill, police found no money in the victim's wallet, on his person, or in the truck. On the console in the truck, police found two pebbles that resembled rock cocaine. A later chemical analysis disclosed the pebbles were not made of cocaine.

Nadine Reese was a resident of the Van Nuys Apartments, located behind the Pierce Apartments; the two buildings are connected by parking lots. Reese, one of defendant's friends, testified she heard something about a killing in a blue pickup truck, and that defendant told her he was the person who "stabbed the white boy" in the truck. Mona Williams later identified a photograph of defendant as the man who stabbed Margetts. Charles Caudell, a fingerprint expert, testified a palm print found on the roof of Margetts's truck (just above the driver's side door) belonged to defendant.

Two days later, on August 27, 1986, Ronald Johnson, accompanied by Carrie Howard, drove into the parking lot at the Van Nuys Apartments in Johnson's pickup truck. Johnson had previously purchased drugs in the parking lot and intended to buy some drugs that day. Three men, including defendant, approached Johnson's truck and offered to sell him cocaine. When defendant showed Johnson his wares, Johnson could tell the pebbles were not rock cocaine and refused to buy. Defendant then said, "Give me your money or I'll kill you," and displayed a large knife with a black handle. As Johnson was reaching under his seat for the money, defendant began jabbing Johnson with the knife. When Johnson handed over the money, defendant stabbed him in the chest.

In the meantime, one of the men accompanying defendant moved to the other side of the truck and grabbed Howard's purse, but she was able to retrieve it. After being stabbed, Johnson drove out of the parking lot, whereupon his lung collapsed and Howard began driving to a hospital. They were stopped by police, who transferred Johnson to the patrol car and transported him to a hospital.

Nadine Reese observed the Johnson stabbing and later identified defendant as Johnson's assailant. Both Johnson and Howard identified photographs of defendant as the man who stabbed Johnson.

The next day, August 28, 1986, police encountered defendant walking with another man and two women near the Pierce Apartments. The other man placed a knife with a fixed blade on the fence as police approached.

Defendant turned and walked away but was apprehended. Police found a type of folding knife (known as a "buck knife") in his waistband. Both the fixed-blade knife and defendant's pants had blood on them.

A police serologist testified the blood on the fixed-blade knife was type O; 48 percent of the population has type O blood. Margetts had type O blood. The blood on defendant's pants was type AB. Both Johnson and defendant have type AB blood. The serologist found no blood on the folding knife. An examination of the enzymes in the blood found on defendant's pants revealed only 4 out of 100,000 persons could have supplied that blood. Johnson's blood fell within the small group of persons with such blood; defendant's did not. The coroner testified that Margetts's fatal wound was consistent with having been caused by the folding knife.

On June 16, 1988, following the close of the day's court proceedings, Bailiff Edward Pena was escorting defendant back to the lockup when defendant exclaimed, " '[W]hy do all them people be lying like that?' " When Pena inquired what he meant, defendant replied, " 'I always stab them with my left hand. That's where I have my power.' " This was apparently in response to Johnson's testimony that day that his assailant held the knife in his right hand.

Four days later, Reese (who also was in jail) found herself on a bus with defendant. Defendant called Reese a "snitch" and said he would "send his people after [her]."

In his defense, defendant called Reginald Berry, who had been walking with Mona Williams and had observed the aborted drug sale between Margetts and defendant. Berry testified the drug seller was shorter than defendant and that he did not look "anything like" defendant. Defendant also called Delores Smith, who had been visiting a friend in a nearby apartment and observed Margetts's murder. Contrary to Williams's testimony that she saw only defendant at the truck, Smith testified she saw *several* people around the pickup truck, saw money changing hands, and then observed a "bunch of confusion" and arguing.

*Penalty Phase*

Cabrina Ross testified for the prosecution at the penalty phase. She stated that a day or so after the Margetts killing, she saw defendant rob a White woman and a Mexican man in separate incidents. In both robberies, defendant accosted the victim in the vicinity of the Pierce Apartments and held a knife to the victim's neck. Nadine Reese also testified at the penalty phase;

she stated defendant told her he stabbed "the white boy in the truck" because he believed Margetts was a police officer. Reese had not testified to this fact at the guilt phase because she had just remembered it.

Defendant's mother, Sharion Cobb-Geiger, and his stepfather, Thomas Geiger, both testified on his behalf at the penalty phase. Cobb-Geiger stated she married Theodore Hill when she was 15 years old, and had 3 children with him. Hill, however, was not defendant's natural father. Cobb-Geiger separated from Hill when defendant was conceived, although she never married defendant's father. She later reconciled with Hill and agreed defendant should take Hill's last name. They separated again when defendant was four or five years old. Hill did not visit defendant very much following the separation.

Cobb-Geiger testified defendant was a good child until he contracted meningitis when in kindergarten. His fever reached 106.75 degrees, and he was in the hospital for 13 days. It was three weeks before his fever fell below one hundred degrees. Following his bout with meningitis, defendant's personality had changed, and he was subject to screaming fits.

When defendant was 11 years old, he was placed in juvenile hall for incorrigibility. When he returned home, he broke windows and furniture and did not attend school. When he was 13 years old, he observed Cobb-Geiger's stepfather shoot and kill her brother. This upset him, as did his aunt's revelation the next year that Theodore Hill was not his natural father.

Cobb-Geiger revealed her parents were "brutal" with her so she decided to be lenient with her children. In retrospect, this turned out to be a mistake, as defendant grew up essentially unsupervised. Cobb-Geiger married Thomas Geiger when defendant was 14 years old. At that time, defendant was a ward of the court and had been placed in a camp. Geiger had little contact with defendant.

## Discussion

Although defendant raises a plethora of asserted legal errors, we discuss only those having some bearing on our conclusion that the cumulative effect of the errors in this case requires reversal. Accordingly, we find: (i) the prosecutor committed constant and egregious misconduct at both the guilt and penalty phases of defendant's trial; (ii) the trial court abused its discretion by failing to determine for itself whether defendant should be shackled inside the courtroom; (iii) the trial court should have excused Bailiff Pena from further courtroom duties after he testified against defendant; (iv) the

trial court erred by failing to instruct the jury to consider the testimony of Bailiff Pena as it would any other witness; and (v) the trial court erred by failing to instruct the jury it must find defendant intended to kill before it could sustain the robbery-murder special-circumstance allegation and further erred by affirmatively instructing the jury it *need not* find defendant harbored the intent to kill.

## A. *Prosecutorial Misconduct*

### 1. *Introduction*

■ The People of the State of California were represented at defendant's trial by Prosecutor Rosalie Morton. Defendant contends she committed numerous acts of prosecutorial misconduct. We agree. ■ "The applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' (*People* v. *Gionis* (1995) 9 Cal.4th 1196, 1214 [40 Cal.Rptr.2d 456, 892 P.2d 1199]; *People* v. *Espinoza* (1992) 3 Cal.4th 806, 820 [12 Cal.Rptr.2d 682, 838 P.2d 204].) Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' (*People* v. *Espinoza, supra,* 3 Cal.4th at p. 820.)" (*People* v. *Samayoa* (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2] (hereafter *Samayoa*).)

■ Regarding the scope of permissible prosecutorial argument, we recently noted " ' "a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature." [Citation.] "A prosecutor may 'vigorously argue his case and is not limited to "Chesterfieldian politeness" ' [citation], and he may 'use appropriate epithets . . . .' " ' (*People* v. *Wharton* [(1991)] 53 Cal.3d [522,] 567-568 [280 Cal.Rptr. 631, 809 P.2d 1279].)" (*People* v. *Williams* (1997) 16 Cal.4th 153, 221 [66 Cal.Rptr.2d 123, 940 P.2d 710].)

Prosecutors, however, are held to an elevated standard of conduct. "It is the duty of every member of the bar to 'maintain the respect due to the courts' and to 'abstain from all offensive personality.' (Bus. & Prof. Code,

§ 6068, subds. (b) and (f).) A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state. (*People* v. *Kelley* (1977) 75 Cal.App.3d 672, 690 [142 Cal.Rptr. 457].) As the United States Supreme Court has explained, the prosecutor represents 'a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.' (*Berger* v. *United States* (1935) 295 U.S. 78, 88 [79 L.Ed. 1314, 1321, 55 S.Ct. 629].) Prosecutors who engage in rude or intemperate behavior, even in response to provocation by opposing counsel, greatly demean the office they hold and the People in whose name they serve. (See *People* v. *Bain* (1971) 5 Cal.3d 839, 849 [97 Cal.Rptr. 684, 489 P.2d 564]; *People* v. *Kelley, supra,* 75 Cal.3d 672, 680-689.)" (*People* v. *Espinoza* (1992) 3 Cal.4th 806, 819-820 [12 Cal.Rptr.2d 682, 838 P.2d 204]; see also *People* v. *Herring* (1993) 20 Cal.App.4th 1066, 1076 [25 Cal.Rptr.2d 213].)

### 2. *The Issue Is Preserved for Appellate Review*

■ At the threshold, respondent contends defendant forfeited appellate review of all his claims of prosecutorial misconduct, because as to each claim his defense counsel, Daniel Blum, either failed to interject a timely and specific objection, failed to request an admonition or curative instruction, or both. ■ "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. (*People* v. *Berryman* (1993) 6 Cal.4th 1048, 1072 [25 Cal.Rptr.2d 867, 864 P.2d 40].)" (*Samayoa, supra,* 15 Cal.4th at p. 841.)

The foregoing, however, is only the general rule. A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. (*People* v. *Arias* (1996) 13 Cal.4th 92, 159 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *People* v. *Noguera* (1992) 4 Cal.4th 599, 638 [15 Cal.Rptr.2d 400, 842 P.2d 1160].) In addition, failure to request the jury be admonished does not forfeit the issue for appeal if " 'an admonition would not have cured the harm caused by the misconduct.' " (*People* v. *Bradford* (1997) 15 Cal.4th 1229, 1333 [65 Cal.Rptr.2d 145, 939 P.2d 259], quoting *People* v. *Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610] (hereafter *Price*).) Finally, the absence of a request for a curative admonition does not forfeit the issue for appeal if "the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request."

(*People* v. *Green* (1980) 27 Cal.3d 1, 35, fn. 19 [164 Cal.Rptr. 1, 609 P.2d 468] (hereafter *Green*); *People* v. *Pitts* (1990) 223 Cal.App.3d 606, 692 [273 Cal.Rptr. 757]; *People* v. *Lindsey* (1988) 205 Cal.App.3d 112, 116, fn. 1 [252 Cal.Rptr. 96]; see also *People* v. *Noguera, supra*, at p. 638 [must request curative admonition "if practicable"].)

▇▇▇ Although defense counsel Blum objected to some of the instances of prosecutorial misconduct, he did not do so in all cases. Moreover, some of the times Blum objected he either did not adequately state the grounds of his objection or failed to request the jury be admonished. Nevertheless, we note Blum was subjected to a constant barrage of Prosecutor Morton's unethical conduct, including misstating the evidence, sarcastic and critical comments demeaning defense counsel, and propounding outright falsehoods. With a few exceptions, all of Morton's misconduct occurred in front of the jury. Her continual misconduct, coupled with the trial court's failure to rein in her excesses, created a trial atmosphere so poisonous that Blum was thrust upon the horns of a dilemma. On the one hand, he could continually object to Morton's misconduct and risk repeatedly provoking the trial court's wrath, which took the form of comments before the jury suggesting Blum was an obstructionist, delaying the trial with "meritless" objections. These comments from the bench ran an obvious risk of prejudicing the jury towards his client. On the other hand, Blum could decline to object, thereby forcing defendant to suffer the prejudice caused by Morton's constant misconduct. Under these unusual circumstances, we conclude Blum must be excused from the legal obligation to continually object, state the grounds of his objection, and ask the jury be admonished. On this record, we are convinced any additional attempts on his part to do so would have been futile and counterproductive to his client. (See *People* v. *Arias, supra,* 13 Cal.4th at p. 159; *People* v. *Noguera, supra,* 4 Cal.4th at p. 638.)

Two examples are illustrative. First, the record shows that when Morton questioned certain witnesses, she confused the serological evidence concerning the fixed-blade knife and the folding knife. (See discussion, *post.*) When Blum objected, the trial court not only erroneously overruled the objection, but *chastised defense counsel in front of the jury*, commenting that *Blum* was the one who was confused and *not Morton*.

Another example demonstrating the futility of interposing defense objections to Morton's constant misconduct occurred when Blum objected to Morton's mischaracterization of Mona Williams's testimony regarding defendant's height. (See discussion, *post.*) When Blum objected because Morton misstated the evidence, the trial court overruled the objection and explained to Blum, in front of the jury, "I'm going to suggest to you [that] earlier you

had a right to present to the jury your views and proper deductions or inferences which the facts warrant. And I've permitted you to do that. I'm going to permit [Prosecutor Morton] to do that. [¶] *Though your interpretation may be not necessarily accurate totally*, that's up to the jury to decide what the interpretation is. She has a right to comment on it, all reasonable inferences and deductions, *as long as they are proper.*" (Italics added.)

As these two examples show, defendant's argument that further objections would have been futile is well taken. Blum could reasonably infer from the general tenor of the trial court's prior rulings and comments that it disfavored additional interruptions of Morton's questioning of witnesses and closing argument, and that if he persisted in objecting Blum would risk additional critical comments from the bench that would suggest to the jury the trial court believed Blum was unnecessarily prolonging the proceedings by interposing "meritless" objections.

Under these unusual circumstances, we find all of the asserted grounds for misconduct were preserved for appellate review. (*People* v. *Arias, supra,* 13 Cal.4th at p. 159; *People* v. *Noguera, supra,* 4 Cal.4th at p. 638.)

### 3. *Bad Faith Not Required*

█ In addition to claiming defendant forfeited all claims of misconduct, respondent also asserts the claims are meritless because defendant makes no showing the prosecutor acted in bad faith. Before 1979, bad faith was a prerequisite to gain appellate relief for prosecutorial misconduct of this type. (See *People* v. *Rhinehart* (1973) 9 Cal.3d 139, 154 [107 Cal.Rptr. 34, 507 P.2d 642]; *People* v. *Romo* (1975) 47 Cal.App.3d 976, 987 [121 Cal.Rptr. 684]; *People* v. *Meneley* (1972) 29 Cal.App.3d 41, 61 [105 Cal.Rptr. 432]; *People* v. *Calpito* (1970) 9 Cal.App.3d 212, 222 [88 Cal.Rptr. 64]; *People* v. *Asta* (1967) 251 Cal.App.2d 64, 86-87 [59 Cal.Rptr. 206]; *People* v. *Jones* (1962) 205 Cal.App.2d 460, 467 [23 Cal.Rptr. 418]; *People* v. *Gould* (1959) 170 Cal.App.2d 489, 492 [338 P.2d 938].) In that year, however, we overruled these prior cases and held a showing of bad faith was no longer required. (*People* v. *Bolton* (1979) 23 Cal.3d 208, 213-214 [152 Cal.Rptr. 141, 589 P.2d 396] (hereafter *Bolton*).) In fashioning this new rule, we explained that "this emphasis on intentionality is misplaced. '[I]njury to appellant is nonetheless an injury because it was committed inadvertently rather than intentionally.'" (*Ibid.,* quoting Note, *The Nature and Consequences of Forensic Misconduct in the Prosecution of a Criminal Case* (1954) 54 Colum. L.Rev. 946, 975.) Thus, "to the extent that cases in this jurisdiction imply that misconduct must be intentional before it constitutes reversible error, they are disapproved." (*Bolton, supra,* at p. 214, fn. omitted.)

*Bolton* has been the law since 1979 (*People* v. *Berryman* (1993) 6 Cal.4th 1048, 1072 [25 Cal.Rptr.2d 867, 864 P.2d 40]; *Price, supra,* 1 Cal.4th at p. 447; *People* v. *Benson* (1990) 52 Cal.3d 754, 793 [276 Cal.Rptr. 827, 802 P.2d 330]; *People* v. *Harris* (1989) 47 Cal.3d 1047, 1079 [255 Cal.Rptr. 352, 767 P.2d 619], disapproved on other grounds, *People* v. *Wheeler* (1992) 4 Cal.4th 284, 299, fn. 10 [14 Cal.Rptr.2d 418, 841 P.2d 938]; see also *People* v. *Nguyen* (1995) 40 Cal.App.4th 28, 35 [46 Cal.Rptr.2d 840]; *People* v. *Pitts, supra,* 223 Cal.App.3d at p. 691; see 5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Trial, § 2905, p. 3555 (hereafter Witkin & Epstein); cf. *People* v. *Alvarez* (1996) 14 Cal.4th 155, 213 [58 Cal.Rptr.2d 385, 926 P.2d 365] [prosecutor's good faith not "crucial" to finding misconduct; standard is an objective one]), and we reaffirm it here.[1] Accordingly, we decline respondent's invitation to reject defendant's claims of prosecutorial misconduct on this ground, and turn instead to the merits of the claims.

### 4. *Claims of Misconduct at the Guilt Phase*

#### a. *Misstating the Evidence*

██ Defendant first contends Prosecutor Morton committed misconduct on several occasions by misstating or mischaracterizing the evidence. ██ Although prosecutors have wide latitude to draw inferences from the evidence presented at trial, mischaracterizing the evidence is misconduct. (*People* v. *Avena* (1996) 13 Cal.4th 394, 420 [53 Cal.Rptr.2d 301, 916 P.2d 1000]; see also *People* v. *Lucas* (1995) 12 Cal.4th 415, 472 [48 Cal.Rptr.2d 525, 907 P.2d 373] [failure to object forfeited claim of misconduct for misstating facts].) A prosecutor's "vigorous" presentation of facts favorable to his or her side "does not excuse either deliberate or mistaken misstatements of fact." (*People* v. *Purvis* (1963) 60 Cal.2d 323, 343 [33 Cal.Rptr. 104, 384 P.2d 424].) ██ Although the line between permissible and impermissible argument may sometimes appear unclear, Morton, as we explain, crossed this line many times.

#### (i) *Blood on the Knife*

Defendant first contends Prosecutor Morton committed misconduct by misleading the jury about the significance of the blood on the fixed-blade

---

[1] To the extent *People* v. *Jones* (1997) 15 Cal.4th 119, 187, 188 [61 Cal.Rptr.2d 386, 931 P.2d 960], *People* v. *Padilla* (1995) 11 Cal.4th 891, 942 [47 Cal.Rptr.2d 426, 906 P.2d 388], *People* v. *Berryman, supra,* 6 Cal.4th at page 1073, and *People* v. *Bonin* (1988) 46 Cal.3d 659, 702 [250 Cal.Rptr. 687, 758 P.2d 1217] hold or suggest a showing of bad faith *is required* to establish prosecutorial misconduct in argument to the jury, those cases are inconsistent with *Bolton* and its progeny and are overruled. We observe that the term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.

knife. The evidence on this point reveals Mona Williams saw defendant "open" a knife before Margetts was stabbed; Johnson, by contrast, stated he (Johnson) was stabbed with a knife with a fixed blade (i.e., not a folding knife). When police located defendant, he was walking with another man and two women. When police approached, the other man placed a fixed-blade knife on the fence; police found a folding knife in defendant's waistband. Forensic testing revealed the presence of human blood on the fixed-blade knife but none on the folding knife. Defendant also had blood on his pants.

The blood on the fixed-blade knife was of an insufficient amount to test any more than that it was type O. Margetts had type O blood, as does 48 percent of the population. Serological testing revealed the blood on defendant's pants was type AB, a type possessed by only about 4 percent of the population. Both defendant and victim Johnson have type AB blood. Certain enzymatic indicators present in the blood found on defendant's pants revealed a combination of blood type and enzymes found in only 4 of every 100,000 persons. Johnson's blood contains such a combination; defendant's blood does not.

In closing argument, the prosecutor characterized the blood on the fixed-blade knife (the type O blood) as "Stuart Margetts's blood." Defendant's objection to this comment was overruled. Morton continued: "And you saw the classification, *and you saw down to the last iota, Stuart Margetts' blood was typed all the way over.* [¶] And [the serologist] formed the opinion that on that knife . . . [the] other knife which was identified along with the [folding knife] . . . belonging to that defendant—was the same blood type O. The very same blood type. [¶] *Classified down, right down to the different classifications as Stuart Margetts. . . .*" (Italics added.) At this point defense counsel Blum objected, claiming Morton had confused the serological evidence concerning Margetts's blood with "the analysis of Mr. Johnson's blood which was sub typed." The trial court overruled the objection, commenting: "No. She is not [confused]. Counsel, there may be some confusion but I am not so sure it rests with her."

Morton continued: "No, I am not confused. [¶] You will see that Mr. Margetts had O type blood. And it's O type on the knife." Later: "As to . . . Mr. Johnson's blood, which was AB, same as defendant, *which was also classified down,* we know for a fact by classification it wasn't the defendant's blood on his pants. That matched Mr. Johnson's blood on his pants. [¶] There is no confusion there." (Italics added.)

On this record, we find defense counsel Blum was indeed correct, and Prosecutor Morton and the trial court were incorrect, regarding the accuracy

of Morton's characterization of the evidence. Only the blood on defendant's pants (the type AB blood) was given the detailed forensic examination for enzyme activity that permitted a more precise inference as to the donor. In Prosecutor Morton's parlance, only the blood on defendant's pants was "[c]lassified down, right down to the different classifications," classified "down to the last iota," or "typed all the way over." Regarding the blood on the fixed-blade knife, all that could be said was that it was type O, a type shared by Margetts and 48 percent of the general population.

Morton thus mischaracterized the evidence by suggesting to the jury the blood found on the fixed-blade knife was sufficiently broken down into enzymatic subclassifications to permit a confident conclusion that it belonged to Margetts. We know this was the meaning of her comments because, when she switched to discussing the serological evidence for the blood on the pants, she noted that blood "was *also* classified down" (italics added), thus suggesting blood samples from *both* the pants and the knife were classified to an equal degree of specificity by the serologist. In thus mischaracterizing the nature of the evidence, Morton committed misconduct.[2] In so doing, she assisted her case by suggesting the serological evidence pointed unerringly to defendant's guilt of stabbing Margetts, whereas the actual evidence was much less damning. That the blood type of the blood found on the knife was consistent with Margetts's blood is true, but the type was also consistent with 48 percent of the population. By falsely asserting the serological evidence was more inculpatory that it actually was, Morton was able to blunt the defense argument of misidentification.

### (ii) *Confusing the Jury Regarding the Knives*

Defendant next points to several instances in which Morton, when questioning witnesses, confused the two knives, calling the fixed-blade knife a buck knife, which is a type of folding knife, as well as referring to the folding knife as a buck knife. Defendant suggests this confusion of the knives was a calculated move to mislead the jury, but even if innocently done it nevertheless had the effect of confusing the jury to the prosecution's advantage.

We find Morton's misdescription of the knives when questioning witnesses misstated the evidence and constituted misconduct. By creating jury confusion over the two knives, the prosecution gained an unfair advantage in

---

[2]Morton did not commit misconduct simply by arguing the blood on the knife was Margetts's blood, for both the blood on the knife and Margetts's blood were type O. It was a permissible inference for the prosecutor to argue the blood on the knife came from Margetts, despite the fact other evidence suggested Margetts was not stabbed with a fixed-blade knife.

two ways. First, if the jury was led to believe (contrary to fact) the fixed-blade knife was the murder weapon, the type O blood on that knife was further proof of defendant's guilt, for that blood was consistent with Margetts's blood. Second, in mixing up the two knives, Morton glossed over an inconsistency in the evidence that was damaging to her case: the type O blood on the fixed-blade knife, which defendant may have used to stab Johnson, was inconsistent with Johnson's blood type.

### (iii) *Williams's Testimony Regarding Defendant's Height*

■ Defendant claims Morton mischaracterized the testimony of Mona Williams regarding the perpetrator's height. We agree. Morton argued: "You were told that Mona Williams said that the defendant was four-four or four-five [*sic*: she meant five-four or five-five], or a short person. *You will not find in this record or any record where she said that*." (Italics added.) Blum objected, interjecting, "That's untrue." When the court overruled his objection, Morton continued: "[*Williams*] *never mentioned* [*the perpetrator was*] *five-three, five-four or anything else*. All she said, it was in comparison. And when I asked her here in this courtroom how tall she thought the defendant was, she told you what she thought. That was her way of estimating height." (Italics added.)

In fact, Williams had testified she was five feet, three inches tall and the perpetrator was a little taller, "about 5'4", 5'5"." Defendant argues this mischaracterization was critical, for defendant's height was a major weakness in the prosecution's case: Defendant is five feet, *ten inches* tall, and the other eyewitness to the Margetts's killing, Reginald Berry, testified the killer was a short man and did not look like defendant. As is clear, Morton again blatantly and categorically mischaracterized the factual record to gloss over an inconsistency in the evidence unfavorable to the prosecution. Her actions thus constituted prosecutorial misconduct.

### (iv) *Mischaracterizing Johnson's Scar*

Defendant contends Morton again mischaracterized the evidence by claiming a large scar on victim Ronald Johnson's chest was caused by defendant when he stabbed Johnson. Morton then used the size of the scar to argue defendant must have intended to kill Johnson.

During Ronald Johnson's testimony, he was asked to exhibit to the jury the scar on his chest. The trial court described it for the record: "[the] scar . . . begins at the highest level, mid chest, and runs approximately 10 inches downward below the right nipple of the chest, about an inch below the

nipple of the chest." In closing argument, Morton urged the jury to find defendant acted with the specific intent to kill when he stabbed Johnson, noting: "You saw the scar. Take a look at it, and you will remember how far across the chest it went. [¶] If you stick it in him two times *and rip his chest open*, you are planning to kill him. [¶] You are not playing a tickling game with him." (Italics added.)

In Blum's closing argument, he told the jury, "as to [Johnson's] scar, I suggest that you go through the medical records. [¶] I believe those records will show you that that big scar on Mr. Johnson's chest is a result of surgery, not the result of a knife." In rebuttal, Morton returned to the topic of Johnson's scar: "By the way, you can look at those hospital reports and you will see [Johnson] was stabbed more than once. *And you will also see that his scar was not by reason of a doctor cutting him from side to top.* The lawyer that had that malpractice action would be doing a pretty good job. He would make quite a few bucks. That was a terrible scar." (Italics added.)

In fact, the hospital records show the larger of the two stab wounds was only two centimeters long. The other stab wound was merely described as "small." We may thus surmise the large scar on Johnson's chest was in fact caused by the emergency surgical intervention required as a result of Johnson's stabbing. The record shows that when Johnson arrived at the hospital, doctors performed an antrolateral thorocotomy to open his thoracic cavity, permitting resectioning the right middle lobe of his lung, which had been damaged by the knife wound. Doctors also repaired a laceration of Johnson's right ventricle, an operation requiring sawing through Johnson's sternum with a gigli saw.

Once again, Morton grossly mischaracterized the evidence and thus committed misconduct. Her misconduct in this regard again worked to bolster a critical weakness in her case: To prove defendant guilty of attempting to murder Johnson, it was necessary to prove that when defendant stabbed Johnson, he intended to kill. (*People* v. *Swain* (1996) 12 Cal.4th 593, 605 [49 Cal.Rptr.2d 390, 909 P.2d 994].) The single major stab wound—two centimeters long—and the second, more minor wound, under the circumstances of the case, were not necessarily conclusive evidence of intent to kill. The People's case would certainly have been enhanced if Morton could have proved the large scar on Johnson's torso was caused by defendant "rip[ping] [Johnson's] chest open" with a knife. Unfortunately for her, the evidence did not show defendant was responsible for that grievous injury.

### b. *Referring to Facts Not in Evidence*

 Defendant next argues Morton committed misconduct when, in closing argument, she referred to facts not in evidence. We have

explained that such practice is "clearly . . . misconduct" (*People* v. *Pinholster* (1992) 1 Cal.4th 865, 948 [4 Cal.Rptr.2d 765, 824 P.2d 571]), because such statements "tend[] to make the prosecutor his own witness—offering unsworn testimony not subject to cross-examination. It has been recognized that such testimony, 'although worthless as a matter of law, can be "dynamite" to the jury because of the special regard the jury has for the prosecutor, thereby effectively circumventing the rules of evidence.' [Citations.]" (*Bolton, supra,* 23 Cal.3d at p. 213; *People* v. *Benson, supra,* 52 Cal.3d at p. 794 ["a prosecutor may not go beyond the evidence in his argument to the jury"]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 108 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Kirkes* (1952) 39 Cal.2d 719, 724 [249 P.2d 1].) "Statements of supposed facts not in evidence . . . are a highly prejudicial form of misconduct, and a frequent basis for reversal." (5 Witkin & Epstein, *supra,* Trial, § 2901, p. 3550.)

### (i) *Suggesting No Similar Crimes Had Been Committed Since Defendant Was Arrested*

 Morton stated in closing argument that Carrie Howard (Johnson's companion when he was stabbed) had been back to the scene of the crime to buy cocaine subsequent to the stabbing and "[s]ince this defendant was arrested and locked up it hasn't happened over there again." No evidence established a reduction in the violent crime or knife assault rate at that particular Pacoima parking lot. Morton thus committed misconduct by suggesting, with no factual support in the record, that she had information not presented to the jury that pointed to defendant's guilt. (See *People* v. *Newman* (1931) 113 Cal.App. 679, 684 [298 P. 1044] [misconduct to argue, without supporting facts, that the number of arson fires in the county were significantly reduced when the defendant, charged with arson, was placed in custody].)

### (ii) *Stating the People Could Have Brought in an Expert*

Blum stated in closing argument that the People never established by expert testimony the pebble-like items found in Margetts's truck were bunk, or fake rock cocaine. From this, Blum urged the jury to find a reasonable doubt that Margetts could tell the difference between real and fake rock cocaine, thereby undermining the prosecution's theory that Margetts balked at the scam and was stabbed as a result.

Morton began her rebuttal argument by opining: "Well, the first thing I'm going to tell you isn't true is counsel stood before you . . . and told you that to find this defendant guilty I have to prove my case beyond a reasonable

doubt; that whatever the bunk was, the narcotic was, or anything else in that truck was, I had to prove it beyond a reasonable doubt what it was; and why didn't I bring in anybody to testify as to that. [¶] Well, first, I'll tell you that the same way he said people that picked up the blood and analyzed it, and the knife, . . . *I could have had somebody come in here and analyze that.* [¶] . . . [But] I don't have to prove anything about that at all."

Defendant contends Morton committed misconduct by asserting she could have called an expert to establish the nature of the substance found in Margetts's truck. To the extent Morton, by these comments, implied an expert would have testified favorably for the prosecution had she called one, she committed misconduct, for she called no such witness.

### (iii) *Attempted Impeachment of Delores Smith*

Delores Smith, called as a defense witness, testified she was in the apartment of her friend, Linda Hill, when she saw the Margetts killing. Contrary to Mona Williams's version of events, Smith testified several people were around the truck and defendant was not one of them. Smith affirmed she had no motive to lie for defendant and in fact did not even know him. During Morton's rebuttal argument, she addressed Smith's testimony: "And there's this big fuss made about there's no reason to lie, no bias. Well, *infer what you can from the fact that the defendant's name is Hill and Linda Hill, who was living upstairs in that apartment, according to Delores Smith, is not here in this courtroom. . . .*" (Italics added.) Blum's objection was sustained.

It was blatantly improper for Morton to invite the jury to infer Smith would lie because her friend, Linda Hill, was a probable relative of defendant. There was no evidence at all of this purported relation, so Morton's argument raised the possibility the jury would assume Morton had some undisclosed knowledge of such a relation. Morton thus committed misconduct. Although Blum's objection to this outrageous fabrication for the jury was sustained, Morton's misconduct in this instance merely added to the growing mountain of deceit and unethical behavior in this case.

### c. *Misstatements of Law*

Defendant next cites four instances in which he claims Prosecutor Morton misstated the law before the jury. "[I]t is improper for the prosecutor to misstate the law generally (*People* v. *Bell* (1989) 49 Cal.3d 502, 538 [262 Cal.Rptr. 1, 778 P.2d 129]), and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements. (*People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1215

[275 Cal.Rptr. 729, 800 P.2d 1159].)" (*People* v. *Marshall* (1996) 13 Cal.4th 799, 831 [55 Cal.Rptr.2d 347, 919 P.2d 1280].)

### (i) *Consideration of Circumstantial Evidence*

 Blum argued that if the circumstantial evidence concerning the sale of fake cocaine to Margetts was reasonably susceptible to an interpretation other than robbery, then defendant should be convicted of some lesser crime, such as theft. Morton countered: "also, under the theory given to you by counsel, if a robber came up to you, took a knife, put it up to you, held out his hand, not saying a word, not doing anything, he never could be convicted of robbery when he got your money nor murder when he put that knife into you and ripped it because if there's another meaning to that evidence—which, of course, is circumstantial evidence, and that's all there ever is when it comes to intent—*if there's another meaning, you have to walk that murderer, that robber out of the courtroom.*" (Italics added.) Blum's objection was overruled.

Defendant is correct that Morton misstated the law concerning the import of circumstantial evidence. (See *People* v. *Yrigoyen* (1955) 45 Cal.2d 46, 49 [286 P.2d 1] [trial court has sua sponte duty to instruct jury that circumstantial evidence leading to conviction must be consistent with guilt and inconsistent with other rational explanations]; 5 Witkin & Epstein, *supra*, Trial, § 2947, p. 3620; CALJIC No. 2.01 (6th ed. 1996 bound vol.).) Further, if defendant obtained Margetts' property without force or fear (thus committing only theft) and then stabbed the victim for some reason unrelated to the theft, Blum would be correct the proper verdict should not reflect reliance on a felony-murder theory and the robbery-murder special circumstance should be found untrue. Morton's assertion, that defendant *must be acquitted of all charges* should the jury agree there was insufficient intent for the charged felony, was legally incorrect, as even Blum conceded the perpetrator would be guilty of second degree murder. Morton thus misstated the law and committed misconduct.

### (ii) *Force or Fear Element for Robbery*

When addressing the perpetrator's hairstyle in closing argument, Prosecutor Morton opined that "[w]hen one sits around in parking lots in order to rob people *and pretend[s] to sell them something in order to get money, which is robbery*, when one does that, they have plenty of time to sit around and change hair styles." (Italics added.) Blum objected: "Objection to selling something to get money is a robbery. That's an incorrect statement of the law." The trial court overruled the objection.

Defendant now claims that, by leaving out the force or fear element for robbery, Morton improperly undermined his main defense that because the force applied to the victim assertedly was not shown to be connected to the theft, there could be no robbery and thus no felony murder. We conclude Morton indeed misstated the law, for pretending to sell someone something in order to get money is not a robbery, there being no showing of force or fear. Although Morton's mischaracterization of the law was brief and tangential to the point of the argument, it subtly undermined defendant's primary defense at the guilt phase, and thus contributed to the overall unfairness of the trial.

 (iii) *Shifting to Defendant the Burden of Showing a Reasonable Doubt*

In her rebuttal argument, Morton addressed the concept of reasonable doubt, stating: "it must be reasonable. It's not all possible doubt. Actually, very simply, it means, you know, you have to have a reason for this doubt. *There has to be some evidence on which to base a doubt.*" Blum objected, noting the statement was incorrect, and that Morton's argument was "putting the burden on me." The trial court overruled the objection, noting: "No, that's not. That's your interpretation of it."[3] Morton then continued: "There must be *some evidence* from which there is a reason for a doubt. You can't say, well, one of the attorneys said so." (Italics added.)

Morton's comments are somewhat ambiguous. Morton, however, committed misconduct insofar as her statements could reasonably be interpreted as suggesting to the jury she did not have the burden of proving every element of the crimes charged beyond a reasonable doubt. (*People* v. *Marshall*, *supra*, 13 Cal.4th at p. 831; *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1215 [275 Cal.Rptr. 729, 800 P.2d 1159].) Further, to the extent Morton was claiming there must be some affirmative evidence demonstrating a reasonable doubt, she was mistaken as to the law, for the jury may simply not be persuaded by the prosecution's evidence. (Cf. CALJIC No. 2.61 (6th ed.

---

[3]This is but another example of how the trial court failed to place reasonable limits on a prosecutor who often approached the line between proper and improper argument, and who many times crossed that line. Even if the trial court believed Morton's argument on this point was permissible, the matter is a close one and the court's chastising Blum threatened to bias the jury. Moreover, due respect for defendant's rights would suggest the court make clear to the jury that defendant bore no burden to prove a reasonable doubt, and that the court took Morton's argument to mean the jury should rely on the evidence presented and not be swayed by the arguments of counsel. By failing to take control of the courtroom, "the trial judge in the instant case allowed the trial to be conducted at an emotional pitch which is destructive to a fair trial." (*People* v. *Bain* (1971) 5 Cal.3d 839, 849 [97 Cal.Rptr. 684, 489 P.2d 564].)

1996 bound vol.) ["the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge"].) On the other hand, Morton may simply have been exhorting the jury to consider the evidence presented, and not attorney argument, before making up its mind.

Although the question arguably is close, we conclude it is reasonably likely Morton's comments, taken in context, were understood by the jury to mean defendant had the burden of producing evidence to demonstrate a reasonable doubt of his guilt. Accordingly, we conclude Morton committed misconduct by misstating the law.

### d. *Derisive Comments and Actions Towards Defense Counsel*

Defendant next claims Prosecutor Morton committed misconduct throughout the trial by engaging in derisive action or making derogatory comments directed at Defense Counsel Blum. A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel. (*People* v. *Wash* (1993) 6 Cal.4th 215, 265 [24 Cal.Rptr.2d 421, 861 P.2d 1107]; *People* v. *Thompson* (1988) 45 Cal.3d 86, 112 [246 Cal.Rptr. 245, 753 P.2d 37]; *People* v. *Perry* (1972) 7 Cal.3d 756, 789-790 [103 Cal.Rptr. 161, 499 P.2d 129], disapproved on other grounds, *Green, supra*, 27 Cal.3d at pp. 28-34; *People* v. *Bain, supra*, 5 Cal.3d at pp. 847-848.) "An attack on the defendant's attorney can be seriously prejudicial as an attack on the defendant himself, and, in view of the accepted doctrines of legal ethics and decorum [citation], it is never excusable." (5 Witkin & Epstein, *supra*, Trial, § 2914, p. 3570.)

The American Bar Association Project on Standards for Criminal Justice, Standards Relating to The Prosecution Function and The Defense Function (Approved Draft 1971) (hereafter ABA Standards), sets forth the standard of courtroom behavior required for a prosecutor: "5.2 Courtroom decorum. [¶] (a) The prosecutor should support the authority of the court and the dignity of the trial courtroom by strict adherence to the rules of decorum and by manifesting an attitude of professional respect toward the judge, opposing counsel, witnesses, defendants, jurors and others in the courtroom. [¶] (b) When court is in session the prosecutor should address the court, not opposing counsel, on all matters relating to the case. [¶] (c) It is unprofessional conduct for a prosecutor to engage in behavior or tactics purposefully calculated to irritate or annoy the court or opposing counsel. [¶] (d) A prosecutor should comply promptly with all orders and directives of the court, but he has a duty to have the record reflect adverse rulings or judicial conduct which he considers prejudicial. He has a right to make respectful

requests for reconsideration of adverse rulings." Commentary to this section further states: "The gravity of the human interests at stake in a criminal trial demands that the proceeding be conducted in an orderly and dignified manner. . . . [¶] Rudeness and intemperance have no place in any court, especially in the relations between its professional members, the judge and lawyers." (ABA Standards, *supra*, com. to std. 5.2, pp. 113-114; see generally, *People* v. *Kelley* (1977) 75 Cal.App.3d 672, 688 [142 Cal.Rptr. 457] [quoting ABA standards].)[4]

The record in this case reveals a rancorous trial, with episodes in which one side (most often the prosecutor) constantly interrupted the other side during the examination of witnesses or closing argument by objections that were marginal at best. The trial was also marked by an apparent personality conflict between Prosecutor Morton and Defense Counsel Blum, with the trial court several times asking both sides to tone down the bickering and focus on the trial at hand.[5] Although some exchanges identified by defendant are too trivial to mention, the flavor of the trial may be gleaned from the fact that when Blum asked Morton to stipulate that the length of the jury box was 20 feet, she retorted, "I certainly will not" and announced in front of the jury that Blum was "unprofessional" and "contemptuous" for even asking her to stipulate.

Another unfortunate episode involved the questioning of Charles Caudell, a fingerprint expert. During cross-examination, Blum asked Caudell whether it was possible to transfer fingerprints from one place to another, whether it had been conclusively proven that no two persons could have the same fingerprints, and whether Caudell had ever made a mistake identifying prints. Morton apparently took extreme umbrage at such questions and insisted that defendant's fingerprints be re-rolled right then, while the jury was watching. Morton insisted: "I want the jury to see it. . . . and I want counsel to put his initials on that roll, so nobody can say they substituted it." When Caudell volunteered that he once made a mistake in training, Morton was unappeased: "No. This is what I want. And I want counsel to sign it." Blum asked the trial court: "Can we have a conference if the district attorney is going to say what she wants?" Morton exclaimed flatly: "I am entitled."

---

[4]Ironically, or perhaps not so, the prosecutor in *People* v. *Kelley*, *supra*, 75 Cal.App.3d 672, in which the Court of Appeal found pervasive prosecutorial misconduct was nonetheless harmless on the record of that case, was Rosalie Morton. (See discussion of defendant's request for judicial notice, *post*.)

[5]For example, the trial court stated at one point: "And we should keep it to what I consider to be a high standard of trial, instead of getting it down to some of these personality things." At another point, the trial court stated: "Why don't we keep this at a level we expect in the courtroom." Still another: "Let's not start on one another. Let's keep it within the argument that you folks want to hear as far as the facts and forget about any personal situations, please."

This entire exchange occurred in front of the jury. The matter was eventually defused and resolved in chambers, but not before Morton accused Blum of having "unabashedly . . . defamed" witness Caudell.

Other disturbing incidents include Morton's audibly laughing in the middle of Blum's examination of both victim Ronald Johnson and witness Robbie Ventura, and getting out of her chair during Blum's examination of witnesses, standing in his line of sight, staring at him and making faces at him. Morton's tactics were petty and childish, heightening the acrimonious atmosphere in the courtroom and threatening the ability of defendant to receive a fair trial. It takes no citation to authority for us to conclude such juvenile courtroom behavior by a public prosecutor demeans the office, distracts the jury, prejudices the defense, and demands censure.

### e. *Intimidating Witnesses*

Defendant next contends Morton committed misconduct by intimidating two defense witnesses. The first instance, a minor incident concerning whether witness Delores Smith should remain on call and give Morton her telephone number, was trivial and did not amount to misconduct. The second incident, threatening Reginald Berry with a perjury prosecution, is much more serious.

Berry, who ultimately testified for defendant and claimed Margetts's killer did not look like defendant, suffered from sickle cell anemia and was ill at the time of trial. Before he testified, and outside the jury's presence, Blum raised with the trial court the issue of prosecutorial intimidation, explaining that Berry was afraid to testify and had been told by Morton that if his testimony did not conform to an earlier taped interview, she would file perjury charges against him. Blum averred that Berry was awake most of the night, worried that he might have to go to prison if he testified for defendant.

Morton explained that Berry's mother told her that "her boy had sickle cell anemia and he could die. And he is very slow. [¶] After that I asked to have him come into court. Because I was going to put him on here as a witness. [¶] She advised me three or four days ago, oh, she was also screaming and hollering in the office, saying he wouldn't testify." After Berry was taken into custody for failure to appear for a jaywalking ticket, he was released, and his mother came and again spoke to Morton. As Morton related the events: "I said, 'Listen, Mrs. Berry, I am totally fed up with how slow he is and how retarded he is, and I am not concerned about that. [¶] He told officers one thing. Then he said that he saw nothing. That the man was about 5'8" or 5'9", and he didn't know him. He went running home to you.'

[¶] And she said, 'Yes, that's what he told me.' [¶] Now the last time I talked to Reginald he tells me it was some little short guy that is not the defendant. [¶] I don't care how slow he is. I do not care how retarded he is. [¶] . . . And I told her, I said, 'You know, he is 23 years old. I don't care anymore if he is retarded. I don't care if he is slow. This is not going to excuse him the rest of his life. [¶] *If he lies on that stand or if he has given the police false information, I will not hesitate to file a felony charge on him,* and I don't care that he is slow, and I will do whatever one does.' " (Italics added.)

Blum added: "Your honor, I would, for the record, state that I believe calling a witness or his mother and stating if they don't state what's on the tape they are going to be charged with perjury, that's prosecutorial misconduct." The trial court impliedly rejected the objection.

■ "Governmental interference violative of a defendant's compulsory-process right includes, of course, the intimidation of defense witnesses by the prosecution. [Citations.] [¶] The forms that such prosecutorial misconduct may take are many and varied. They include, for example, statements to defense witnesses to the effect that they would be prosecuted for any crimes they reveal or commit in the course of their testimony. [Citations.]" (*In re Martin* (1987) 44 Cal.3d 1, 30 [241 Cal.Rptr. 263, 744 P.2d 374].) Threatening a defense witness with a perjury prosecution also constitutes prosecutorial misconduct that violates a defendant's constitutional rights. (*People* v. *Bryant* (1984) 157 Cal.App.3d 582 [203 Cal.Rptr. 733].)

■ Because Berry eventually testified for defendant, no prejudice flowed from this individual act of misconduct. (*In re Martin, supra,* 44 Cal.3d at p. 31.) Nevertheless, we cannot emphasize strongly enough that, although Morton could seek to impeach Berry at trial if he testified inconsistently with his pretrial statement, it was improper to have threatened him in advance of trial with a perjury prosecution. Had Berry succumbed to Morton's threat and refused to testify, Morton's blatantly unethical behavior would have threatened to undermine the entire adversarial process, as Berry, along with Delores Smith, was a key defense witness. Indeed, although Berry found the courage to testify for defendant, risking a threatened perjury prosecution, it is possible the added stress engendered by Morton's threat of prosecution affected Berry's emotional state and his demeanor on the stand, evidencing a hesitancy that Morton exploited in closing argument. This, then, comprises just one more example of Morton's misconduct during defendant's trial.

As is clear, Morton several times committed prosecutorial misconduct during the guilt phase of the trial. Although we do not wish to minimize any

of Morton's actions at the guilt phase, we note the most egregious were: (i) her patent misstatements of the facts in closing argument regarding the serological evidence, Williams's testimony regarding the perpetrator's height, and the cause of Johnson's chest scar; (ii) her improper references to alleged facts outside the record in asserting the absence of similar crimes following defendant's arrest, and in insinuating familial ties between defendant and Linda Hill; (iii) her misstatements of the law; and (iv) her threat to charge a defense witness with perjury should he testify for the defense. Unfortunately, Morton's misconduct was not limited to the guilt phase.

### 5. Claims of Misconduct at the Penalty Phase

Defendant next cites numerous instances of alleged prosecutorial misconduct at the penalty phase. Although some of the claims are meritless and do not require discussion, others, as we explain, are not so benign. As in the guilt phase, we conclude that given the pervasive nature of Morton's misconduct, any attempt by Blum to object to Morton's misconduct would have been futile. Accordingly, we find the claims of penalty phase misconduct are properly before this court.

### a. Reliance on Biblical Doctrine

 Defendant argues Morton committed prejudicial misconduct by twice referring to the Bible in closing argument. Apparently anticipating a defense plea for mercy, the prosecutor tried to explain why the biblical maxim "Vengeance is mine sayeth the Lord" should not dissuade the jury from imposing the death penalty, for the Bible also says "an eye for an eye, a tooth for a tooth."[6]

By relying on the Bible in this manner, Morton committed misconduct. As we have explained repeatedly, an appeal to religious authority in support of

---

[6]This invocation of the *lex talionis,* the ancient law of retributive justice based on Mosaic law (Webster's New Internat. Dict. (3d ed. 1981) p. 1302), would appear to be a favorite of prosecutors in some capital cases. (See, e.g., *People* v. *Wash, supra,* 6 Cal.4th at p. 259, fn. 18; *People* v. *Montiel* (1993) 5 Cal.4th 877, 934 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; *People* v. *Sandoval* (1992) 4 Cal.4th 155, 192 [14 Cal.Rptr.2d 342, 841 P.2d 862], affd. *sub nom. Victor* v. *Nebraska* (1994) 511 U.S. 1 [114 S.Ct. 1239, 127 L.Ed.2d 583].)

We cannot emphasize too strongly that to ask the jury to consider biblical teachings when deliberating is patent misconduct. (*People* v. *Wash, supra,* 6 Cal.4th at p. 261.) Moreover, although such matters of theology are, of course, well beyond our purview, we observe some scholars have suggested reliance on the *lex talionis* in this context may oversimplify the meaning of the pertinent scriptural passages. (See McCann, *Opposing Capital Punishment: A Prosecutor's Perspective* (1996) 79 Marq. L.Rev. 649, 702; see also Walle, *Doing Justice: A Challenge for Catholic Law Schools* (1997) 28 St. Mary's L.J. 625, 626; Rudolph, *The Misguided Reliance in American Jurisprudence on Jewish Law to Support the Moral Legitimacy of Capital Punishment* (1996) 33 Am. Crim. L.Rev. 437, 446, 451.)

the death penalty is improper because it tends to diminish the jury's personal sense of responsibility for the verdict. (*People* v. *Wash, supra,* 6 Cal.4th at p. 261; *People* v. *Sandoval, supra,* 4 Cal.4th at pp. 191-194; *People* v. *Wrest* (1992) 3 Cal.4th 1088, 1105-1107 [13 Cal.Rptr.2d 511, 839 P.2d 1020].) Such argument also carries the potential the jury will believe a higher law should be applied and ignore the trial court's instructions. (*People* v. *Wrest, supra,* at p. 1107.) Significantly, Morton was not responding to a defense argument invoking religious authority. (*People* v. *Sandoval, supra,* at pp. 193-194.)

### b. *Referring to Matters Outside the Record; Misstating the Facts*

 Defendant contends that at the penalty phase Morton continued her practice, begun during the guilt phase of the trial, of both asserting facts before the jury that were not in the record and mischaracterizing facts that did appear in the record.

#### (i) *Knives Called "Uzis"*

Morton asked Cabrina Ross whether defendant called his knives his "Uzis," an apparent reference to the name of a semiautomatic rifle some-times used in violent street crimes. Ross replied she did not remember or did not know. In closing argument, however, Morton averred: "[Defendant] likes the feel of a knife. He likes to use his knife. [¶] *You heard what he called them.* What was it she said? 'Oh, I forgot the name.' [¶] I said, 'Did you tell the police officer what he called the knives?' [¶] And she said, 'I told them that.' [¶] And I said, 'Is that Uzi?' [¶] And she said, 'I forgot the name.' [¶] And she told you that he named his knives. *He called them that.* He likes that." (Italics added.)

Defendant correctly contends Morton committed misconduct by stating as a fact something Ross did not say. If Morton had evidence defendant called his knives by a particular name, she should have presented evidence in that regard.

#### (ii) *Misrepresenting Defendant's Prior Record*

In closing argument, Morton opined: "And everything [defendant] ever did one way or another, he got away with. [¶] *He has killed. He has stabbed. He has robbed. He has gone to prison for it.* He has not been rehabilitated under any guise or thought." (Italics added.) Contrary to Morton's insinuation, defendant's prior convictions did not involve homicide, stabbings of any kind, or robbery. His prior convictions were for assault by means likely

to cause great bodily harm (§ 245, subd. (a)), and for grand theft from the person (former § 487, subd. 2). The assault conviction involved defendant's fists, not a knife. Morton thus grossly mischaracterized defendant's record and thereby committed misconduct.

### (iii) *Other Claims*

Defendant next complains that on several occasions Morton made statements in argument that essentially allowed her to testify, unfairly supplying facts not in the record. For example, at one point Morton described the conditions of life in prison, implying that such a life was not a sufficient punishment for defendant. At another point, she stated the jury would hear defense arguments that prosecutors always hear, thereby implying the defense arguments were stock arguments and should be disregarded. At still another point, Morton spoke to the possibility of rehabilitation, stating: "Some people in state prison can, I guess, be rehabilitated. I haven't seen too many, and I have been around a lot." Defendant contends that by these comments, Morton improperly testified and, as an apparently veteran prosecutor, created a danger the jury would give her claim of experience heightened credibility. Although these comments were brief and mild, and thus could not have been prejudicial standing alone, they contributed to the overall unfairness of the trial.

### c. *Rude Behavior Towards Defense Counsel*

 Defendant also contends the prosecutor engaged in rude and demeaning behavior towards defense counsel in front of the jury during the penalty phase, and that these displays were so extreme that they deprived defendant of his constitutional right to effective assistance of counsel. For example, when Blum interjected that he could not hear Morton's closing argument, she cracked: "Is it all right if I continue whether or not he hears?" When Blum stated the court had ruled Cobb-Geiger should be allowed to see the medical records from a hospital, Morton replied: "No. The court didn't. And I don't pay attention to you." Twice during bench conferences, Blum asked Morton to keep her voice down so the jury would not hear their discussion. Morton expressed indignation and refused in both instances to agree to lower her voice.

As in the guilt phase, Prosecutor Morton exhibited a dismissive, sarcastic and, at times, abrasive personality. We need not determine whether any individual instance of misconduct was itself prejudicial, for each contributed to the general acrimonious atmosphere that threatened defendant's right to a fair trial. We reiterate, however, that such "offensive personality" is not

appropriate from a representative of the state's interests. (*People* v. *Kelley*, *supra*, 75 Cal.App.3d at p. 690.)

In sum, Morton's misconduct was not confined to the guilt phase of defendant's trial. Unfortunately, moreover, her misconduct during trial, though serious, was not the only legal error in defendant's trial.

### B. *Shackling*

Defendant contends the trial court abused its discretion by improperly delegating to the sheriff's department the decision to have him shackled. We agree.

#### 1. *The Facts*

During pretrial proceedings on April 8, 1988, the parties were discussing with the trial court the availability of Reginald Berry, a witness who was seriously ill. Defendant suddenly stood up and exclaimed, "Oh shit. I am going back. Shit." He then left the courtroom "on his own." At the next court date on April 19, 1988, defense counsel stated: "[Defendant] is in front of the court because he has been made a security risk or an escape risk because of the fact when he was here in a hearing the last time we were in court, as the court recalls, he stood up and walked towards the lockup saying he had enough of this shit. . . . I feel that whoever decided that statement made him an escape risk was making an incorrect judgment. [¶] I would ask for a minute order stating that the court does not consider the defendant to be an escape risk and feels he should be taken off whatever security status he is in now if the Sheriff's Department feels that also." The court replied: "*I don't know what precipitated his status of being a security risk. I don't know what that was.*" (Italics added.)

Defendant then explained that, although he simply walked back to the bullpen, Bailiff Pena had reported defendant tried to walk out of the courtroom. The court replied: "But understand, Mr. Hill, the fact that we all have a responsibility here in the courtroom. I am the judge. She has a job. She has a job. Mr. Pena has a job. [¶] And the attorneys have a job. Everybody. [¶] And we have to maintain—in other words, when you stood up and left, or wherever, we can't read your mind." When defendant objected that he did not try to leave the courtroom, the court said: "Okay. I will have the minute order show that you stood up in the courtroom. *But whether or not the Sheriff['s Department] is going to change their mind, see, I don't interfere in their business.*" (Italics added.)

Later, after defendant's unsuccessful *Faretta* and *Marsden* motions (*Faretta* v. *California* (1975) 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562];

*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]), defendant complained of being shackled on the bus that transported him from the jail to the courthouse. The court informed him the sheriff's department was in charge of such security, and suggested that whether or not defendant was actually trying to escape when he abruptly stood up and left the courtroom during the previous court session, the sheriff's department was entitled to think so. While the trial court was explaining the situation, defendant abruptly cut the court off in midsentence and announced: "I am ready to go." The court responded: "That's what we are talking about."

As promised, the trial court noted in the record that on April 8, 1988, "the defendant stood up and walked toward the lock up area, and not the front door, prior to the conclusion of the proceedings because he stated he was tired of listening to the court proceedings. He also did that at the hearing [on April 19, 1988]."

Jury selection began at the next court session, on April 26, 1988. Before the first prospective juror was called, the following occurred:

"MR. BLUM: Before anyone comes in the defendant has noticeable chains around his legs. I think if the jurors see those it would be prejudicial against my client.

"THE COURT: Do we have anything to cover his legs?

"THE BAILIFF: He can keep them behind the desk.

"MR. BLUM: Is it necessary that he wears those chains?

"THE COURT: *I believe the [sheriff's] department has said so.* Why don't we put a chair there so they can't be seen. Something that will block off that. [¶] Would you be kind enough, Mr. Blum, to walk back and see if you can see them. *Can you see them?*

"MR. BLUM: I believe so. [¶] *I think that's okay.*

"THE COURT: Can't see them from the spectator section?

"MR. BLUM: Unless you look very, very hard. It's possible you could see one or two links.

"THE COURT: All right. Let's call in [the first juror]." (Italics added.)

At two subsequent court sessions, defendant objected to the leg restraints, but the complaints went to his discomfort with the shackles and not to their legal justification.

## 2. *Discussion*

■ We discussed the applicable law in *People* v. *Duran* (1976) 16 Cal.3d 282 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1](hereafter *Duran*). Citing the "possible prejudice in the minds of the jurors, the affront to human dignity, the disrespect for the entire judicial system which is incident to unjustifiable use of physical restraints," we "reaffirm[ed] the rule that a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a *manifest need for such restraints*. [Citation.]" (*Id.* at pp. 290-291, italics added, fn. omitted; see also § 688 ["No person charged with a public offense may be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge."].) Such a " '[m]anifest need' arises only upon a showing of unruliness, an announced intention to escape, or '[e]vidence of any nonconforming conduct or planned nonconforming conduct which disrupts or would disrupt the judicial process if unrestrained . . . .' " (*People* v. *Cox* (1991) 53 Cal.3d 618, 651 [280 Cal.Rptr. 692, 809 P.2d 351] (hereafter *Cox*), quoting *Duran, supra,* at p. 292, fn. 11.) "Moreover, '[t]he showing of nonconforming behavior . . . must appear as a matter of record . . . . The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion.' " (*Cox, supra,* at p. 651, quoting *Duran, supra,* at p. 291.) A court's decision to place a defendant in physical restraints will not be overturned on appeal unless there is a "showing of a manifest abuse of discretion." (*Duran, supra,* at p. 293, fn. 12; *Cox, supra,* at p. 652; *People* v. *Sheldon* (1989) 48 Cal.3d 935, 945-946 [258 Cal.Rptr. 242, 771 P.2d 1330].)

This emphasis that a showing exist on the record of "manifest need" for shackles presupposes that it is the trial court, not law enforcement personnel, that must make the decision an accused be physically restrained in the courtroom.[7] A trial court abuses its discretion if it abdicates this decision-making responsibility to security personnel or law enforcement. (*People* v. *Jackson* (1993) 14 Cal.App.4th 1818, 1825 [18 Cal.Rptr.2d 586] [abuse of discretion to delegate shackling decision to bailiff]; *People* v. *Jacla* (1978) 77 Cal.App.3d 878, 885 [144 Cal.Rptr. 23] [same].) "The imposition of restraints in a proper case is normally a judicial function in which the prosecutor plays no necessary part. . . . [I]t is the function of the court, not

---

[7]Defendant's complaint that he was chained while on the bus that transported him from the jail to court poses a different situation. Because his physical restraint while outside of court and not in the jury's presence could have no effect on his ability to receive a fair trial, such decisions are clearly within the discretion of the law enforcement personnel in charge of such out-of-court activities. (*Duran, supra,* 16 Cal.3d at p. 289; *People* v. *Jacobs* (1989) 210 Cal.App.3d 1135, 1141 [258 Cal.Rptr. 734].)

the prosecutor, to initiate whatever procedures the court deems sufficient in order that it might make a due process determination of record that restraints are necessary." (*Duran, supra,* 16 Cal.3d at p. 293, fn. 12.)

▪ In this case, the record is clear the trial court failed to hold a hearing on, or otherwise determine for itself, whether adequate justification existed to physically restrain defendant in the courtroom. Instead, the trial court deferred to the sheriff's department's decision that shackles were necessary. When defendant complained about the decision to place him in leg restraints, the court explained that "I don't interfere in [the sheriff's department's] business." Later, when defense counsel asked whether it was necessary defendant wear the chains, the court replied, "I believe the [sheriff's] department has said so," implying the court had no say in the matter. By failing to determine independently whether, in its view, there existed a manifest need to place defendant in restraints, the trial court abdicated its responsibility and abused its discretion. (*Duran, supra,* 16 Cal.3d at p. 293, fn. 12; *People* v. *Jackson, supra,* 14 Cal.App.4th at p. 1825.)

C. *Admission of Bailiff Pena's Testimony*

While Bailiff Ed Pena was escorting defendant back to the lockup following the close of victim Ronald Johnson's testimony on June 16, 1988, defendant made some incriminating statements. Pena returned to the courtroom and recited the following for the court reporter: "As I was escorting Mr. Hill to the lock up, he tells me, he says, 'why do all them people be lying like that?' And I said, 'Why, Mr. Hill?' . . . He said, 'because I always stab them with my left hand. That's where I have my power.'" Four days later, on June 20, 1988, the prosecutor indicated she would call Pena to testify before the jury regarding these statements, and Defense Counsel Blum requested a hearing pursuant to Evidence Code section 402. At this hearing, Pena essentially reiterated what he previously had told the court reporter. Defense Counsel Blum moved to exclude the testimony on the grounds it was more prejudicial than probative (Evid. Code, § 352) and was improper character evidence (Evid. Code, § 1101). The trial court denied the motion. In addition, the trial court denied a motion to modify the testimony so that it would refer only to victim Johnson. Pena eventually testified before the jury.

▪ Defendant makes several claims of error with regard to the trial court's decision to permit Pena to testify, none of which we find meritorious. We agree with defendant, however, that the trial court should have transferred Pena to another courtroom after he testified. (See *People* v. *Cummings* (1993) 4 Cal.4th 1233, 1290 [18 Cal.Rptr.2d 796, 850 P.2d 1].) Moreover, the court should have instructed the jury sua sponte not to give Pena's

testimony any artificial weight merely because he was a bailiff. (*Id.* at p. 1291.)[8] Such precautions are necessary to avoid any unfairness to an accused. Later in this opinion, we address the cumulative prejudice from the trial court's failure to transfer Pena and its failure to admonish the jury.

### D. *Instruction on Intent to Kill (Carlos Error)*

The trial court instructed the jury that to find true the alleged robbery-murder special-circumstance allegation, it need not find defendant intended to kill. In this, the court erred. In 1983, this court held that intent to kill was a necessary element of the felony-murder special circumstance. (*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] (hereafter *Carlos*).) We overruled *Carlos* four years later in *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306] (hereafter *Anderson*), concluding intent to kill was not an element of the felony-based special circumstances. "As to offenses committed after *Carlos* but before *Anderson*, however, due process and ex post facto principles demand that the intent-to-kill requirement apply to any felony-murder special circumstance charged in connection with such offenses." (*People* v. *Johnson* (1993) 6 Cal.4th 1, 44 [23 Cal.Rptr.2d 593, 859 P.2d 673]; see also *People* v. *Marshall* (1997) 15 Cal.4th 1, 41-44 [61 Cal.Rptr.2d 84, 931 P.2d 262].)

Defendant committed his crimes within the so-called *Carlos* "window period," that is, between our decision in *Carlos* and its subsequent overruling in *Anderson*. Accordingly, the *Carlos* intent-to-kill requirement applies in his case. In this case, defense counsel moved to have the jury instructed on intent to kill; the trial court erroneously denied the motion. To compound the error, the court specifically instructed the jury that if it found "beyond a reasonable doubt that the defendant was the actual killer, *you need not find that the defendant intended to kill* a human being in order to find the special circumstance to be true." (Italics added.)

Respondent essentially concedes there was error, but strenuously argues it was harmless beyond a reasonable doubt. In light of our disposition, we need not decide the impact of the error standing alone, and decline to do so. We now turn to the question of the cumulative prejudice flowing from all the trial errors that occurred in this case.

---

[8]Although respondent suggests defendant may have forfeited the right to raise these two points by: (i) failing to move that Pena be relieved of his courtroom duties; and (ii) failing to request a pinpoint instruction on proper consideration of Pena's testimony, this omission is not fatal. Our concern is with whether the errors related to Pena's testimony adversely affected defendant's right to a fair trial.

E. *Cumulative Prejudice*

 To reiterate, we find the following errors occurred in defendant's trial: (i) the prosecutor committed serious, blatant and continuous misconduct at both the guilt and penalty phases of trial; (ii) the trial court abused its discretion by failing to decide for itself whether defendant should be shackled when inside the courtroom; (iii) the trial court should have excused Bailiff Pena from further courtroom duties after he testified against defendant; (iv) the trial court erred by failing to instruct the jury to consider the testimony of Bailiff Pena as it would any other witness; and (v) the trial court committed *Carlos* error (*Carlos, supra,* 35 Cal.3d 131).

Defendant contends the cumulative effect of the errors requires reversal of the judgment. Respondent argues none of the instances of misconduct nor any of the trial errors, considered singly or together, requires reversal, noting that defendants are entitled to "fair trials" but not "perfect ones." We have, on occasion, made the same observation (see, e.g., *People* v. *Bradford* (1997) 14 Cal.4th 1005, 1057 [60 Cal.Rptr.2d 225, 929 P.2d 544]; *People* v. *Osband* (1996) 13 Cal.4th 622, 702 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *People* v. *Cain* (1995) 10 Cal.4th 1, 82 [40 Cal.Rptr.2d 481, 892 P.2d 1224]; *People* v. *Beeler* (1995) 9 Cal.4th 953, 994 [39 Cal.Rptr.2d 607, 891 P.2d 153]; *People* v. *Marshall* (1990) 50 Cal.3d 907, 945 [269 Cal.Rptr. 269, 790 P.2d 676]), but such a truism cannot be allowed to obscure the true nature of the pertinent inquiry now before us. As Justice Benjamin Cardozo once said in a different context, "[c]atch words and labels . . . are subject to the dangers that lurk in metaphors and symbols, and must be watched with circumspection lest they put us off our guard." (*Henneford* v. *Silas Mason Co.* (1937) 300 U.S. 577, 586 [57 S.Ct. 524, 528, 81 L.Ed. 814].) We take defendant's claim to be a call not for a "perfect" trial, but for one in which his guilt or innocence was fairly adjudicated. We turn to that question.

Lengthy criminal trials are rarely perfect, and this court will not reverse a judgment absent a clear showing of a miscarriage of justice. (Cal. Const., art. VI, § 13; see also *Chapman* v. *California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065] [harmless-beyond-a-reasonable-doubt standard applies to review of federal constitutional error].) Nevertheless, a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error. (*People* v. *Purvis, supra,* 60 Cal.2d at pp. 348, 353 [combination of "relatively unimportant misstatement[s] of fact or law," when considered on the "total record" and in "connection with the other errors," required reversal]; *People* v. *Herring, supra,* 20 Cal.App.4th at pp. 1075-1077 [cumulative prejudicial effect of prosecutor's improper statements in closing

argument required reversal]; see *In re Jones* (1996) 13 Cal.4th 552, 583, 587 [54 Cal.Rptr.2d 52, 917 P.2d 1175] [cumulative prejudice from defense counsel's errors requires reversal on habeas corpus]; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 214-227 [233 Cal.Rptr. 404, 729 P.2d 839] [same]; see also *Samayoa, supra,* 15 Cal.4th at p. 844 [prosecutorial misconduct does not require reversal "whether considered singly or together"]; *People* v. *Bell* (1989) 49 Cal.3d 502, 534 [262 Cal.Rptr. 1, 778 P.2d 129] [considering "the cumulative impact of the several instances of prosecutorial misconduct" before finding such impact harmless]; cf. *People* v. *Espinoza, supra,* 3 Cal.4th at p. 820 [noting the prosecutorial misconduct in that case was "occasional rather than systematic and pervasive"].)

Defendant's trial, as seen, was far from perfect. In the circumstances of this case, the sheer number of instances of prosecutorial misconduct and other legal errors raises the strong possibility the aggregate prejudicial effect of such errors was greater than the sum of the prejudice of each error standing alone. (Cf. *People* v. *Roberts* (1992) 2 Cal.4th 271, 326 [6 Cal.Rptr.2d 276, 826 P.2d 274] [concluding "the whole" of the trial errors "did not outweigh the sum of their parts"].)

At the outset, we may not escape the fact defendant was forced to suffer constant and outrageous misconduct by Prosecutor Morton. A prosecutor commits misconduct under state law if he or she uses "deceptive or reprehensible methods" in an attempt to persuade the jury. (*Samayoa, supra,* 15 Cal.4th at p. 841; *People* v. *Espinoza, supra,* 3 Cal.4th at p. 820; *People* v. *Strickland* (1974) 11 Cal.3d 946, 955 [114 Cal.Rptr. 632, 523 P.2d 672].) Morton's actions, at times childish and unprofessional and at other times outrageous and unethical, betrayed her trust as a public prosecutor. Her methods were deceptive and reprehensible.

Although we might conclude any single instance of misconduct was harmless standing alone, we cannot ignore the overall prejudice to defendant's fair trial rights caused by Morton's pervasive campaign to mislead the jury on key legal points, as well as her unceasing denigration of defense counsel before the jury. It is true that, with the exception of the *Carlos* error, the jury was properly instructed on the law; these instructions included the admonition that the arguments of counsel are not evidence, and that the trial judge would read the jury the law. Also true is that, as to some of Morton's acts of misconduct, Blum objected and the trial court sustained the objection, thereby diminishing the prejudice flowing from that particular misconduct. Given, however, the onslaught of the misconduct that occurred in this case, it became increasingly difficult for the jury to remain impartial. "It has been truly said: 'You can't unring a bell.' " (*People* v. *Wein* (1958) 50 Cal.2d 383,

423 [326 P.2d 457] (dis. opn. of Carter, J.).) Here, the jury heard not just a bell, but a constant clang of erroneous law and fact.

Morton's misconduct, considered in the aggregate, may very well be sufficient of itself to require reversal of both the guilt and penalty judgments. We need not reach that question, however, for other errors, as previously discussed, occurred in this case. The trial court, as indicated, improperly abdicated its judicial role of determining whether defendant posed a sufficient danger of escape that he must be shackled when before the jury. Instead, the court erroneously deferred to the decision of the sheriff's department. ■■■ Although the record does not disclose the jury ever saw or heard the chains restraining defendant, the use of such restraints (assuming for argument they were unjustified) raises other possibilities of prejudice. Shackles may affect a defendant's mental state during trial. "[One] danger inherent in imposing physical restraints is the possibility that the defendant may feel confused, frustrated, or embarrassed, thus impairing his mental faculties. [Citation.]" (*Spain* v. *Rushen* (9th Cir. 1989) 883 F.2d 712, 722 (hereafter *Spain*), cert. den. *sub nom. Rushen* v. *Spain* (1990) 495 U.S. 910 [110 S.Ct. 1937, 109 L.Ed.2d 300].) Shackles may also impair a defendant's ability to cooperate or communicate with counsel. (*Ibid.*; *Illinois* v. *Allen* (1970) 397 U.S. 337, 344 [90 S.Ct. 1057, 1061, 25 L.Ed.2d 353].) The pain and "consequential burden placed on the body and mind of the defendant" (*Spain, supra,* at p. 723) must also be considered. In addition, this court has noted shackles may inhibit a defendant's willingness to take the stand and testify on his own behalf. (*Duran, supra,* 16 Cal.3d at p. 290.) It thus is especially important that the trial court not abdicate to law enforcement personnel its decisionmaking responsibility concerning the necessity of restraining the defendant.

■■■ The court also erred in permitting Pena to remain a functioning courtroom officer after he testified. This could only reinforce defendant's feeling that the law conspired against him, for a supposedly neutral officer of the court was now his accuser. Moreover, the jurors would likely, and unjustifiably, accord Pena's testimony added weight, for he was a uniformed officer charged with their protection. The trial court should have avoided these problems by transferring Pena to another courtroom and instructing the jury to give Pena's testimony no extra weight.

The most serious error affecting the determination of the appropriate penalty related to the trial of the felony-murder special-circumstance allegation: the court's delivery to the jury of an instruction erroneously removing from its consideration the key mental element—intent to kill—of the main crime in this case, the murder of Stuart Margetts. Although the evidence

showing defendant stabbed the victim in the chest could have supported a jury finding of intent to kill, other possible explanations were also possible (e.g., a desire merely to incapacitate the victim or an intent to injure with no intent to kill), and it is questionable that intent to kill was proved beyond a reasonable doubt. Since the robbery-murder special circumstance was the only special circumstance alleged, without a true finding defendant would not have been eligible for the death penalty.

The sheer number of the instances of prosecutorial misconduct, together with the other trial errors, is profoundly troubling. Considered together, we conclude they created a negative synergistic effect, rendering the degree of overall unfairness to defendant more than that flowing from the sum of the individual errors. Considering the cumulative impact of Morton's misconduct, at both the guilt and penalty phases of the trial, together with the *Carlos* error and the other errors throughout the trial, we conclude defendant was deprived of that which the state was constitutionally required to provide and he was entitled to receive: a fair trial. Defendant is thus entitled to a reversal of the judgment and a retrial free of these defects.

In reaching this conclusion, we address an institutional concern as well. Our public prosecutors are charged with an important and solemn duty to ensure that justice and fairness remain the touchstone of our criminal justice system. In the vast majority of cases, these men and women perform their difficult jobs with professionalism, adhering to the highest ethical standards of their calling. This case marks an unfortunate exception. ██ We take judicial notice of a 1987 unpublished opinion of the Court of Appeal, Second Appellate District, Division Two, affirming a conviction of Roderick Congious, which not only cites Deputy District Attorney Rosalie Morton for prosecutorial misconduct, but identifies her as the offending prosecutor in two other, published appellate court decisions in which the Court of Appeal found prosecutorial misconduct without identifying the prosecutor. (See *People* v. *Kelley, supra,* 75 Cal.App.3d 672, 680-682; *People* v. *Mendoza* (1974) 37 Cal.App.3d 717, 726-727 [112 Cal.Rptr. 565].)[9] As the opinions in these cases make clear, defendant's is

---

[9]Respondent opposes judicial notice on the ground that rule 977, California Rules of Court, prohibits the citation of unpublished opinions with exceptions he claims do not apply here. We disagree. The appellate opinion in which the Court of Appeal affirmed the conviction of Mr. Congious falls within the category of the "[r]ecords of . . . any court of this state"; accordingly, we may take judicial notice of such records. (Evid. Code, § 452, subd. (d).) Because we do not cite or rely on that opinion, judicial notice does not in this circumstance run afoul of rule 977, California Rules of Court.

not the first case in which this prosecutor committed misconduct.[10] We are confident the prosecutors of this state need no reminder of the high standard to which they are held, and that the rule prohibiting reversals for prosecutorial misconduct absent a miscarriage of justice in no way authorizes or justifies the type of misconduct that occurred in this case.

### F. Claims of Insufficiency of Evidence

Because we are reversing the judgment on other grounds, we need not address defendant's other claims. He argues, however, there was insufficient evidence to support his convictions for robbing Margetts and Howard. If defendant is correct, double jeopardy principles would prevent his retrial on those counts. (*Burks* v. *United States* (1978) 437 U.S. 1 [98 S.Ct. 2141, 57 L.Ed.2d 1].) Accordingly, we proceed to address those claims for the benefit of a possible retrial. (See *People* v. *Memro* (1985) 38 Cal.3d 658, 690 [214 Cal.Rptr. 832, 700 P.2d 446].)

#### 1. Robbery of Margetts

Defendant contends the evidence proving he committed a robbery of Margetts, as opposed to a mere theft, was legally insufficient and requires we reverse his robbery conviction. From this premise, defendant argues we must also reverse his murder conviction (as it was obtained on a felony-murder theory), as well as the robbery-murder special-circumstance allegation (former § 190.2, subd. (a)(17)(i)). We reject these arguments and find the evidence of robbery sufficient.

" 'When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a rational trier of fact

---

[10]For example, in the appellate opinion affirming the conviction of Mr. Congious, the Court of Appeal recounts that Morton actually boasted of her antics in the *Kelley* case despite the Court of Appeal's rather strident rebuke of her courtroom tactics:

"Mrs. Morton: People versus Kell[e]y was affirmed. People v. Kell[e]y *is probably one of the best cases* around. *I love it, every minute of it.* [¶] The only thing I did wrong—

"The Court: Folks, we are getting—

"Mrs. Morton: —was to sass the judge which I won't do again and never did again, but I don't have to stipulate. I can do all my discovery on the record.

"The Court: Wait a minute.

"Mrs. Morton: Don't ever mention Kell[e]y to me again.

"The Court: Folks, let's keep this friendly.

"Mrs Morton: We are no longer friendly. I am so sick of people citing this case to me. *It was affirmed.*" (Italics in original.)

The Court of Appeal noted in a footnote immediately following the quoted passage that "We also note with regret that even her claim that she will no longer 'sass the judge' is belied by the present record. . . ."

could have found the defendant guilty beyond a reasonable doubt.' " (*People v. Jennings* (1991) 53 Cal.3d 334, 364 [279 Cal.Rptr. 780, 807 P.2d 1009], quoting *Green, supra,* 27 Cal.3d at p. 55; see also *People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) When undertaking such review, our opinion that the evidence could reasonably be reconciled with a finding of innocence or a lesser degree of crime does not warrant a reversal of the judgment. (*People v. Bean* (1988) 46 Cal.3d 919, 933 [251 Cal.Rptr. 467, 760 P.2d 996].)

■■■ The Penal Code defines robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) In arguing the evidence of robbery was insufficient, defendant emphasizes the alleged inconsistencies and weaknesses in Mona Williams's identification of him. For example, Williams reported to police the assailant was between five feet, four inches and five feet, five inches tall, whereas defendant is five feet, ten inches tall. After some confusion, Williams testified defendant placed his *left* hand on the roof of Margetts's truck; a palm print of defendant's *right* hand was found on the truck. Defendant also points out that Reginald Berry testified defendant definitely was not the assailant, and Delores Smith reported seeing other men around the car. Williams did not see defendant actually stab Margetts.

These are merely discrepancies in the evidence the jury considered and resolved against defendant. Moreover, defendant fails to consider the evidence *against* him: He admitted his guilt to Nadine Reese; he made inculpatory statements to Bailiff Pena; when arrested, he was carrying a knife and his pants were bloody; he committed an almost identical crime within 48 hours of stabbing Margetts; and his palm print on the truck placed him at the scene. Although Williams did not see defendant actually stab Margetts, she saw him open a knife before she looked away. About 10 seconds later, Williams saw Margetts attempt to drive off, only to expire a short time later from a stab wound in the chest. Margetts was known to have $200 (indeed, Williams reported seeing him count out bills), yet police found no American money in Margetts's truck. Police found pebbles of bogus rock cocaine in the truck. This evidence, considered as a whole and in a light favorable to the judgment below, comprises substantial evidence of robbery.

Defendant posits other possible scenarios which are consistent with a finding of innocence or, at least, a finding he committed theft but not robbery. For example, he asserts it is possible he merely sold Margetts something and some other person came along and stabbed the victim, or that he stabbed Margetts without the intent to rob, and someone came later and

took the victim's money. That the evidence could be[11] consistent with other possible scenarios is irrelevant, however, so long as there was substantial evidence from which a rational trier of fact could have found defendant robbed Margetts. As explained above, there was substantial evidence of a robbery.

 Defendant also argues he could have obtained Margetts's money by false pretenses (passing off the bunk as real cocaine), stabbing him only when he discovered the ruse and attempted to reclaim his money. Although defendant suggests the "force or fear" element required for robbery would then be lacking, he is mistaken. "[E]ven if the perpetrator used peaceful means, such as a pretext, to separate the property from the victim, 'what would have been mere theft is transformed into robbery if the perpetrator . . . [later] uses force to retain or escape with [the property].'" (*People* v. *Webster* (1991) 54 Cal.3d 411, 441 [285 Cal.Rptr. 31, 814 P.2d 1273].)

Defendant compares his case to *People* v. *Morris* (1988) 46 Cal.3d 1 [249 Cal.Rptr. 119, 756 P.2d 843], disapproved on another point, *In re Sassounian* (1995) 9 Cal.4th 535, 543-544, footnote 5 [37 Cal.Rptr.2d 446, 887 P.2d 527], in which we reversed a robbery conviction and a robbery-murder special-circumstance allegation for insufficient evidence. In *Morris*, the murder victim was found naked except for socks and shoes. We concluded there was no evidence "from which the jury could reasonably infer that [the] defendant deprived the victim of personal property in his possession by means of force or fear." (*People* v. *Morris*, *supra*, at p. 20.) By contrast, in the instant case the evidence was that the victim had $200, he was holding the money in his hands and counting it out in preparation of a transaction to purchase cocaine, and, 10 seconds later, he had neither money nor cocaine and had been stabbed in the chest. The facts in this case are manifestly different from those in *Morris*. We conclude there was sufficient evidence defendant robbed Margetts.

### 2. *Robbery of Howard*

 Defendant also contends the evidence was insufficient to convict him of robbery with respect to victim Carrie Howard. He argues the evidence was insufficient to show Howard's robber actually took her purse with the intent permanently to deprive her of it, and insufficient to show defendant aided and abetted the robber. Although the evidence was not strong, we find sufficient evidence of both a taking and aiding and abetting.

---

[11]Although defendant's hypotheticals are within the realm of the possible, it is unlikely in the extreme that anyone other than the man Williams identified as defendant was the assailant. Williams saw both Margetts counting out currency and defendant open a knife. She looked away for "about ten seconds" and, when she looked back, defendant was gone and the victim began driving away, mortally wounded. From Williams's vantage point, the possibility of a third actor in this deadly tableau seems quite unlikely.

There were two witnesses to Howard's robbery.[12] The first was Ronald Johnson, who was stabbed by defendant but survived. Johnson testified that when he drove into the parking lot, "three black guys approached [him] and asked if [he] wanted to buy anything." Defendant did the talking and conversed with Johnson through the driver's side open window. After defendant stabbed him, Johnson noticed one of the three assailants "was trying to grab [Howard's] purse." The man "got it but he gave it back," apparently because it contained nothing of value. Johnson did not know Howard's assailant, but when asked whether the man "was with the defendant," he replied, "yes." He also agreed that defendant and Howard's robber came over to the car "together."

Howard told a similar story. When asked whether defendant and the two other men were together, she replied: "Well, when we first came [into the parking lot,] *they were together and then they spread out*." (Italics added.) Two men, including defendant, stayed on the driver's side of the car; the third man came to her side. This third man grabbed her purse.

Because defendant did not take Howard's purse, his guilt of robbery must have been predicated on an aiding and abetting theory. Defendant argues the evidence was insufficient to prove he harbored the requisite mental state of an aider and abettor. ▪▪▪ "A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People* v. *Cooper* (1991) 53 Cal.3d 1158, 1164 [282 Cal.Rptr. 450, 811 P.2d 742] (hereafter *Cooper*); see *People* v. *Beeman* (1984) 35 Cal.3d 547, 561 [199 Cal.Rptr. 60, 674 P.2d 1318].)

▪▪▪ Mindful of the standard of review on appeal for sufficiency of evidence questions (see *People* v. *Jennings, supra*, 53 Cal.3d at p. 364, discussed, *ante*), we conclude that, although no direct evidence showed defendant acted with the required knowledge and purpose, there was substantial evidence from which a rational trier of fact could have found he in fact possessed such a mental state. Defendant was observed standing with Howard's robber and a third man. The three men approached Johnson's car together and then "spread out," essentially surrounding the car. While defendant dealt with Johnson at the driver's side of the car, eventually robbing and attempting to kill him, Howard's assailant was simultaneously attempting forcibly to divest Howard of her purse. From these facts, the jury

---

[12]Nadine Reese testified she saw some people in the parking lot with defendant and observed defendant stab Johnson, but did not see the Howard robbery.

could reasonably infer that defendant and Howard's robber were working together. Certainly their behavior immediately prior to the crimes in question (standing together and then approaching the car by spreading out and surrounding it) suggests a preconceived plan of attack. We conclude the evidence of aiding and abetting was sufficient.

Defendant also contends the evidence was legally insufficient to demonstrate a taking of personal property. We disagree. ▇▇▇ "The taking element of robbery has two necessary elements, gaining possession of the victim's property and asporting or carrying away the loot." (*Cooper, supra,* 53 Cal.3d at p. 1165.) ▇▇▇ Johnson, an eyewitness, testified Howard's assailant grabbed the purse from Howard, looked through it, declined to take anything from inside the purse and then gave it back. This comprises substantial evidence from which a rational jury could have concluded a taking occurred. Moreover, once there has been a taking, "it is no defense that the property taken was restored, even though this occurs almost immediately." (2 Witkin & Epstein, *supra,* Crimes Against Property, § 635, pp. 715-716; see also *People* v. *Hall* (1967) 253 Cal.App.2d 1051, 1054 [61 Cal.Rptr. 676] [defendant's return of stolen wallet did not absolve him of robbery]; *People* v. *Strauss* (1925) 75 Cal.App. 447, 455 [243 P. 67] [same re defendant's immediate return of $3 he took from victim].)

Defendant claims for the jury to credit Johnson's testimony rather than Howard's would have been irrational. When asked whether her assailant "got" her purse, Howard replied, "no." Continuing with her testimony, however, Howard stated she got the purse "back" from the robber, testifying she pulled the purse "back." This testimony suggests Howard had, if only briefly, lost possession of the purse.

Defendant also contends the evidence was insufficient Howard's robber asported or moved the purse an adequate distance to constitute robbery. ▇▇▇ To satisfy the asportation requirement for robbery, "no great movement is required, and it is not necessary that the property be taken out of the physical presence of the victim." (2 Witkin & Epstein, *supra,* Crimes Against Property, § 641, p. 723.) "[S]light movement" is enough to satisfy the asportation requirement. (*Cooper, supra,* 53 Cal.3d at p. 1165; *People* v. *Pham* (1993) 15 Cal.App.4th 61, 65 [18 Cal.Rptr.2d 636].) ▇▇▇ Viewing the facts in a light most favorable to the judgment below, we find substantial evidence from which the jury could have concluded beyond a reasonable doubt that when Howard's robber took possession of her purse, he moved it a slight distance from inside the car to his possession. This was sufficient; indeed, even where the only movement was the victim placing

money into a paper bag, courts have found sufficient asportation to justify a conviction for robbery. (See *People* v. *Price* (1972) 25 Cal.App.3d 576, 578 [102 Cal.Rptr. 71].) We reiterate only slight movement is required. We conclude the evidence was sufficient to prove defendant was guilty of robbing Howard.

## CONCLUSION

The judgment is reversed. The People remain free to retry defendant for the charged crimes.[13]

George, C. J., Mosk, J., Kennard, J., Baxter, J., Chin, J., and Brown, J., concurred.

**GEORGE, C. J.**—I concur in the thoughtful analysis set forth in the court's opinion. I write separately to express my view that the prosecutorial misconduct (together with the *related* erroneous rulings by the trial court) committed in this case in itself requires reversal of the judgment. (See maj. opn., *ante*, at pp. 819-839.)

As the court aptly has pointed out: "[W]e may not escape the fact defendant was forced to suffer the constant and outrageous misconduct by Prosecutor Morton. . . . Morton's actions, at times childish and unprofessional and at other times outrageous and unethical, betrayed her trust as a public prosecutor. Her methods were deceptive and reprehensible. [¶] Although we might conclude any single instance of misconduct was harmless standing alone, we cannot ignore the overall prejudice to defendant's fair trial rights caused by Morton's pervasive campaign to mislead the jury on key legal points, as well as her unceasing denigration of defense counsel before the jury." (See maj. opn., *ante*, at p. 845.)

I have signed the court's opinion because I agree with its conclusion that the cumulative prejudice flowing from the prosecutor's misconduct and other errors rendered defendant's trial fundamentally unfair. (See maj. opn., *ante*, at pp. 844-848.) Cumulative prejudice, however, is but one basis for

---

[13]Pursuant to Business and Professions Code section 6086.7, because we are reversing the judgment due to the gross misconduct of an attorney, we are required to report our decision to the State Bar for investigation of the appropriateness of initiating disciplinary action against Rosalie Morton. (See *In re Jones*, *supra*, 13 Cal.4th at p. 589, fn. 9.) Although the misconduct in the present case occurred prior to the enactment of the current version of the applicable statute, there is no problem of retroactivity. (*Ibid.*)

reversal in the present case. The points summarized in the preceding paragraph (taken together with the trial court's erroneous rulings related to such misconduct) in my view were sufficient to render defendant's trial fundamentally unfair.