Filed 1/21/14  P. v. Gomez CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | G048828 |
|             v. | (Super. Ct. No. 12CF2517) |
| VICTOR MARTIARENA GOMEZ, | O P I N I O N |
|     Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, James A. Stotler, Judge.  Affirmed.

Richard L. Fitzer, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

\*          \*          \*

A jury found defendant Victor Martiarena Gomez guilty of aggravated assault on Detective Duran, Detective Chacon, Detective Zuniga, Sergeant Paulson, Detective Salo and Detective Gutierrez in violation of Penal Code section 245, subdivision (c), as charged in counts one through six of the information. (Unless otherwise indicated, all statutory references are to the Penal Code.) Defendant was also found guilty of violating Vehicle Code sections 2800.2 and 12500, evading while driving recklessly and driving without a license, but pursuant to the prosecutor's motion, count 10, driving without a license, was dismissed. The jury found defendant not guilty of violating section 422, making criminal threats as charged in count eight. With regard to count nine, battery of Courtney Griffin, the jury informed the court there was no reasonable probability they would arrive at a verdict, and the court dismissed count nine. The court sentenced defendant to three years in state prison.

We appointed counsel to represent defendant on appeal. Counsel filed a brief which set forth the facts of the case. Counsel did not argue against the client, but advised the court no issues were found to argue on defendant's behalf. Counsel did not suggest any areas of inquiry, but requested this court "independently review the entire record on appeal for arguable issues." We have examined the record and found no arguable issue. (*People v. Wende* (1979) 25 Cal.3d 436.)

Defendant was given 30 days to file written argument in defendant's own behalf. That period has passed, and we have received no communication from defendant. Nonetheless we have read defendant's lengthy description of the facts, which he told the court he personally prepared for the probation department.

I

FACTS

*The Initial Incident*

On August 22, 2013, Courtney Griffin, an auto detailer, was dropping an employee, Adam Van Sickle, off at his home in Santa Ana. The two were sitting in

2

Griffin's truck when they heard "some guy like cussing." Griffin described what happened next: "We were sitting there talking. I heard somebody going by at a fast rate. And then also I asked Adam did you know him, and Adam said, 'No.' And then next thing I noticed was somebody — boom, somebody hit me right here in my head. And I looked at Adam, and I'm like, Dude, is this a dream?" In a later description, Griffin said he was cold cocked.

Griffin got out of his truck and walked toward the man who hit him and said: "Come on, let's do this. You can like hit me in my eye and I don't even know you, so I said, let's do it, like do it like men. Me and you, right now." The man ran over to his truck and said: "I'll get my gun. I'm going to shoot you." The man grabbed an object, and Griffin told Van Sickle, "Man, call the cops."

Griffin said the man called him the "N" word and told him to go back to Africa. Griffin asked the man what he had done to him, and the man kept calling him the "N" word and saying, "you're lazy." The man then "started running away like a little girl," threw whatever the object was into his truck and drove away. When the prosecutor asked Griffin what the object looked like, Griffin responded: "To me it was silver. If I had to — I would say — I can't really tell, but I would say it was like a .32." He added: "Pistol."

While Van Sickle was on the phone with the police, Griffin followed the man. At some point, Griffin saw police cars.

*First Pursuit of Defendant*

Pedro Duran, a police officer in the gang unit of the Santa Ana Police Department, was near the corner of Flower St. and St. Gertrude in Santa Ana on August 22, 2013 at approximately 5:00 p.m. He was in uniform and riding in the right front passenger seat of a black-and-white police vehicle. His partner, Detective Zuniga, was driving. They received a broadcast about a driver of a vehicle who was armed with a

3

firearm and last seen in the area of Flower and Warner. They were given a description of the vehicle and a license number.

The officers pulled behind the vehicle, activated their police emergency lights, and the vehicle pulled over. They ordered the man out of his truck. No weapons were found on the man's person or in his truck, and the police placed him in the backseat of their patrol car "until we contacted the victims." Duran identified defendant as the person they detained.

At the conclusion of the police investigation, Duran gave defendant some options: "I — since he was unlicensed, I asked him if he wanted to call somebody to come pick him up that had a valid driver's license, or he could leave his car there and he could walk away. However, I gave him a lawful order that he wasn't allowed to drive just because he had no license." Duran observed defendant lock his vehicle and walk away.

*The Traffic Collision*

After defendant walked away, Duran and his partner drove westbound on Flower St. "to help out a couple of my partners that were involved in the traffic collision." Duran said: "Two police cars involved. One was a patrol officer that was involved in the accident, and the other one was Detective Chacon, who was part of the gang unit, that was involved in the accident as well."

There were three police cars in the immediate area. Six officers were present: "Sergeant Paulson, Detective Salo, Detective Chacon, Detective Gutierrez, Detective Zuniga and [Duran]."

At the scene of the collision, Duran and Zuniga were in charge of directing traffic, and making sure the investigating officers were in a safe area. Paulson was documenting the accident as the supervisor.

*Defendant at the Scene of the Traffic Collision*

As he was standing in the street during the collision investigation, Duran noticed that defendant's truck was no longer parked where it had been left. Then he heard tires screeching. He looked up and saw a truck making a left turn from Flower, onto Anahurst, where the investigation was taking place.

Duran described what happened next: "After I told my partners that the vehicle wasn't slowing down and continued approaching us, we all started walking south towards the sidewalk. It was then that I heard the engine of the vehicle become more pronounced, became louder, as the vehicle continued to accelerate toward us."

Duran continued his description: "As the truck continued toward us, I noticed that the driver removed his left hand outside the window in kind of an aggressive manner and clenched his fist as he continued eastbound toward us." The truck was about 45 feet away from the police officers when defendant turned the steering wheel directly toward them. Duran recognized defendant as the driver: "At this point I told my partners heads-up, this car isn't stopping. I then realized that it was the defendant Mr. Gomez. As the vehicle became close to us, I saw Mr. Gomez turn the steering wheel to the right towards us. At this point I ended up — I was standing behind Sergeant Paulson, and I pushed Sergeant Paulson towards the sidewalk."

Other officers ran toward the sidewalk. After Duran shoved Paulson out of the roadway, Duran jumped on top of the trunk of a police vehicle. When the truck actually passed by, it was "about a foot away." According to Duran, "if I would have remained right where I was standing, I guarantee you that truck would have hit me or Sergeant Paulson."

Duran described what happened after defendant's truck passed by: "I remember seeing the — Mr. Gomez, the defendant, remove his upper portion, upper body out of the driver's side window, and look back at us, and using one of his hands and while looking at us, I guess, flipping us off with his middle finger."

5

*Second Pursuit of Defendant*

Duran and Zuniga ran to their police vehicle, turned on the lights and siren, and drove toward defendant's truck. Defendant was driving at a high rate of speed with a "screeching noise" coming from his rear tires. He did not stop at a stop sign and cut off other vehicles in a congested area. One car had to veer to the right to avoid a collision and traffic came to "a screeching halt." The officers stopped their pursuit.

Police ran the license plate of the truck defendant was driving, and found it was registered to an address in Santa Ana. Defendant was not at that address, but about 30 minutes later Duran spotted defendant's truck. Once again, the officers turned on their lights and siren. Defendant accelerated, and "began driving southbound in the northbound lanes" on Main St. Eventually defendant came to a stop in an industrial area.

The officers pulled behind defendant's stopped truck. Duran exited the police vehicle and defendant began backing up toward the officers. With guns drawn, the officers ordered defendant to place his truck in park, and eventually he complied.

The officers ordered defendant to show his hands, but he kept his hands below "towards like his waistband area." Zuniga tasered defendant, and Duran opened the driver's door and handcuffed defendant. Defendant was "agitated, upset, screaming profanities" at the officers.

Police transported defendant to the hospital to get treatment for his left hand, and "the nurses were asking him how he obtained the injury, and he was telling them that he had punched — he had punched a guy before [police] stopped him."

*Defendant's Testimony*

Defendant was driving in Santa Ana when his food fell to the floor of his truck, so he pulled over in a residential area to pick it up. As he was eating, he "saw

6

through the rearview mirror that the red truck was behind me with the engine on." Defendant testified he asked the driver of the other truck whether he was following him, and the other driver "insulted" defendant. Defendant denied saying he had a gun and said he told Griffin he did not want to fight, "and I got in my truck, and I left that place."

At some point, defendant realized the other truck was following him. Then a police car "was next to my window." Defendant described what happened next: "I spoke with a Detective Duran. I asked him for help. I tried to explain the confrontation I had had, and I told him I was going to park."

Defendant was detained inside the patrol car while the police spent about 10 minutes searching his truck, with defendant's permission. At that point, according to defendant, the officers told him he could leave, but the officers never asked to see his driver's license or ordered him not to drive his vehicle.

After the officers left, defendant got his things in order, searched for his money and continued driving. He was not upset or angry with the officers in any way.

When he crossed Flower St., he could see Zuniga and Duran talking to a woman. He saw no traffic accident, and there were no other people on the street. He did not accelerate his engine or speed. He drove around the police car at 30 miles an hour.

After about 50 to 60 feet, defendant stopped his truck. When he was asked why he stopped, he replied: "I was thinking if I had done something, something bad." He turned backwards, saw the officers in front of their police car. He saw no motion from them, and he kept on driving.

Defendant noticed no police cars behind him. He did not speed. He stated: "I don't believe I ever committed any violation." He stopped because his hand was swollen and he had no money for gas. He was thinking about going to his boss to ask for money for gas, and had been stopped for four to five minutes.

When he continued driving, he saw the police. He explained: "I thought that the police officer had been behind me for a few minutes, and I thought that the best thing for me to do was to park as soon as possible." He complied with orders to put his hands out the window and open the car door, but "when I had my hands in the air through the window, they — they started tasing me. I opened the door at that moment, and that's when I got the shots."

The police took him to the hospital "because my hand was swollen." He did not tell anyone he broke his hand while punching someone. He said his hand was swollen because "when I tried to cover my face, I — he hit his hand against mine."

*Court Rulings*

The trial judge ruled it would not permit the prosecution to introduce defendant's prior convictions for impeachment purposes.

After defense counsel raised a doubt about defendant's competency, the court appointed Dr. Roberto Flores de Apodaca to examine defendant pursuant to Evidence Code section 730. The doctor reported to the court that defendant is lucid, rational and cogent in his thinking. After the doctor made his report to the court, defense counsel withdrew his doubt of defendant's mental competency. The court found defendant was not mentally incompetent.

II

DISCUSSION

We have reviewed the entire record and find no irregularities. (*People v. Wende*, *supra*, 25 Cal.3d 436.) Defendant's rights were protected throughout the trial and other proceedings. Substantial evidence, evidence that is credible and of solid value from which a rational trier of fact could have found defendant guilty beyond a reasonable doubt, supports his conviction. (*People v. Hill* (1998) 17 Cal.4th 800, 848-849.)

## III

## DISPOSITION

The judgment is affirmed.


MOORE, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


THOMPSON, J.