Filed 12/16/24  P. v. Contreras CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUAN CARLOS CONTRERAS,<br><br>    Defendant and Appellant. | H048703<br>(Santa Clara County<br>Super. Ct. No. C1363256) |

After a jury convicted Juan Carlos Contreras of child sexual abuse, the trial court denied his motion for new trial and sentenced him to a term of 80 years to life in prison. On appeal, Contreras argues his convictions must be reversed because the trial court abused its discretion by failing to dismiss a juror for inattentiveness, erroneously admitted expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS), and erroneously instructed the jury on CALCRIM No. 1193.  Contreras further argues the prosecutor committed prejudicial misconduct in closing argument and that trial counsel rendered ineffective assistance by failing to object to that misconduct.  Finally, Contreras contends that the criminal justice administration (CJA) fee the trial court imposed must be vacated.

We agree with the parties that effective July 1, 2021, any unpaid portion of the $129.75 CJA fee the trial court imposed must be vacated.  (See Gov. Code, § 6111, subd. (a), added by Stats. 2020, ch. 92, § 11; see also *id*., former § 29550.1.)  But

Contreras forfeited his claim of juror misconduct and has established no prejudicial error. We vacate the CJA fee and otherwise affirm the judgment.

## I.    BACKGROUND

The Santa Clara County District Attorney filed an information charging Contreras with four counts of aggravated sexual assault of a child under age 14 and 10 or more years younger than the defendant (Pen. Code, § 269; counts 1, 3, 4 & 6), and two counts of sexual intercourse or sodomy with a child 10 years of age or younger (§ 288.7, subd. (a); counts 2 & 5).[1]  The charged offenses took place between October 1, 2006 and March 1, 2007.  The victim, M. Doe, disclosed the abuse for the first time in 2012 and an arrest warrant for Contreras was issued in 2013.  Contreras was arrested in January 2018 and the case proceeded to trial in June 2019.

### A.    *Doe's Testimony*

At the time of the charged offenses, Contreras was in an intimate relationship with Doe's mother, D.M., and lived with D.M., Doe, and Doe's two older brothers in an apartment in San Jose.  Though Contreras was not Doe's biological father, Doe considered him to be a stepfather and called him "dad."  Doe, 18 at the time of trial, testified that Contreras began sexually abusing him when he was five or six.  The abuse took place in the bedroom Contreras shared with D.M.  Doe testified that though he slept in the living room with his brothers, he was often in the bedroom during the day to watch cartoons because that was where the television was located.  Contreras would come into the room, close the door, and force Doe to participate in anal or oral sex, sometimes both.  After each incident of abuse, Doe suffered from pain and discomfort in his anus, throat, and jaw.

Doe testified that Contreras sexually abused him daily for approximately one week, and that while most of the abuse took place during the day, one incident occurred

---

[1] Undesignated statutory references are to the Penal Code.

2

at night. Doe could not recall where his mother was during the nighttime incident but believed she was at work. Doe went along with Contreras's abuse because Contreras was a "father figure" to him and he did not want to make Contreras angry. Doe testified that after forcing him to participate in oral or anal sex, Contreras would sometimes praise Doe by calling Doe his favorite child, which gave Doe "solace" and "reassured [him] that what [he] was doing was okay at that time." The sexual abuse stopped a couple of months before Doe's youngest brother was born and never resumed. By Doe's estimate, Contreras put his penis in Doe's anus four times and his penis in Doe's mouth "about three times."

Doe did not tell his mother about the abuse at the time because Contreras said he would "eventually tell her" so there was no reason for Doe to "confess." Contreras also suggested that if Doe told D.M. about the abuse, Doe "would be taken away from" them and would not be able to see them again. Shortly after D.M. gave birth to Doe's youngest brother, Contreras and D.M. separated and Doe, D.M., and Doe's siblings went to live with Doe's grandmother. When Doe was 11 years old, Doe told D.M. and his pastor about the abuse for the first time but did not provide specific details. After confiding in his mother and pastor, Doe reported the abuse to the police.[2]

On cross-examination, Doe was impeached with prior statements from his police interview and from Contreras's preliminary examination, and Doe admitted that some of those statements were "lie[s]." Doe admitted having imaginary friends throughout his childhood but denied that the sexual abuse he suffered was imaginary. Doe stated that his

_____

[2] Pastor Francisco Guerrero was unavailable to testify at trial and the parties stipulated to the following: "[I]f called as a witness, [Pastor Guerrero] would testify that in July of 2012 he met with . . . Doe and his mother, [D.M.], in his office. During the meeting, he asked [Doe] if anyone had ever abused him. [Doe] covered his face and responded, 'Yes.' [Doe] said that his stepfather had raped him approximately five years before, when he was 5 to 6 years old. [¶] When asked to clarify if he was just touched or raped, [Doe] said that he had been penetrated."

3

memory and understanding of the events surrounding the sexual abuse had "gotten better" with time.

**B.      *CSAAS Evidence and CALCRIM No. 1193***

Over defense objection, the prosecution called Anthony Urquiza, Ph.D., who was designated as an expert "in the myths and misperceptions about child sexual abuse and child sexual abusers."  Preliminarily, Urquiza explained that he did not know the underlying facts of the case, had not interviewed any participants or reviewed any reports, and did not know what the specific charges were.  Urquiza clarified that CSAAS is not a diagnostic tool to determine whether a child had been sexually abused, that using CSAAS for such a purpose is "inappropriate," and that "[t]he responsibility for determining whether somebody was abused or not or whether somebody was a perpetrator or not is [the] responsibility of a jury."

Urquiza testified that a common misperception about child sexual abuse victims is that they will report the abuse immediately:  "[W]hile it does sometimes happen that kids disclose soon after that initial instance of abuse, by far most kids have a significant delay before they're able to tell for the very first time of their abuse."  Such a delay, Urquiza explained, can last "months or years, even decades."  Even when a child victim reports sexual abuse, the report is often incremental and "unconvincing" because the account is likely to change over time and is more like a process than an act.  Urquiza explained that child sexual abuse victims "may tell you something and then later on give you more information; or they may tell you something and it may not be, from an adult view . . . [a] convincing argument, but it is their perception of what happened."  The child victim may provide "impossible" or "seemingly implausible" details in their disclosure, such as saying they were abused "thousand[s of] times" when they simply mean the abuse had occurred over and over.  Urquiza explained that it is "common" for child victims reporting sexual abuse to not display "outward signs of significant distress when disclosing."

4

On cross-examination, Urquiza was asked about "confabulation," which he defined as "[e]ssentially making up something that didn't happen." Urquiza testified there was "no body of research to support the idea that confabulation is the source of allegations that children have made with regard to being sexually abused."

Just after Urquiza testified, the trial court read the following instruction to the jury: "Dr. Urquiza's testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not [Doe's] conduct was not inconsistent with the conduct of someone who has been molested and evaluating the believability of his testimony." The court read CALCRIM No. 1193 to the jury again at the close of evidence.

## C.     *Contreras's Testimony*

Contreras testified that he began dating D.M. in 2003 and moved in with her that same year, when Doe was five years old. While living together, Contreras helped to pay rent and living expenses and cooked meals for the children. The couple lived in a two-bedroom apartment where initially, Contreras, D.M., and Doe slept in one bedroom while Doe's older brothers slept in the other, but after some friends came to live with them, the two older kids moved into the living room. Contreras testified that he and D.M. would often have sex when Doe was in bed with them and that this made Doe "very upset." Contreras attempted to persuade D.M. to have Doe sleep in the living room with the other boys but Doe would "cry too much" and need to be with his mother. After the couple moved to another apartment, Doe continued to sleep with Contreras and D.M., who continued having sex "on a regular basis" while Doe was in bed with them. Doe acted "very offended" and angry toward Contreras and at one point told Contreras, "My mom is mine."

Contreras stated that during the time he lived with D.M., he never played with Doe or his brothers but would observe Doe playing with his "imaginary friends." After the

5

couple's new baby was born, Doe was forced to go into the living room to sleep with his brothers, at which point he became even more resentful toward Contreras and at one point kicked him in the shins. Doe also pulled the baby's ears and "crush[ed]" the baby's foot, though the baby was not injured as a result of Doe's actions. Because Doe's behavior "got worse" after the baby's birth, Contreras talked to D.M. about possibly disciplining Doe, but D.M. told him not to do anything because Doe "was not [Contreras's] child."

After the baby was born, Contreras discovered that D.M. was cheating on him with her boss. When he confronted D.M. about the affair and told her he was moving out, she became "like a crazy person" and threatened Contreras by telling him he would be "paying for it."[3] Contreras moved out of state to Florida and ended their relationship. However, he and D.M. stayed in touch, both because they shared a child and because D.M. "loved [him] a lot" and wanted to get back together. After Contreras moved to Florida, D.M. brought two of the children (including Doe) to visit him on one occasion but the couple never lived together again. Contreras denied ever sexually abusing Doe.

### D.    *Juror No. 2's Self-Reported Inattentiveness*

At the beginning of trial, the jury included two alternates. Juror No. 12 was excused and replaced with Alternate Juror No. 1. Juror No. 10 was then excused and replaced with the last alternate juror. Contreras began his testimony the morning of June 17, 2019, a Monday. After the lunch hour, Juror No. 2 told the court and counsel that she had been the victim of domestic violence since the last court session and that her husband had been arrested on felony charges with a restraining order. The juror explained that she had no one to watch her three children and that she was also "not sure

---

[3] Contreras's sister-in-law testified on Contreras's behalf and similarly recounted hearing D.M. say in 2011 that "she would rather see [Contreras] dead or in jail." The sister-in-law also recounted D.M telling Contreras in March 2012, "You're going to pay for everything you've done to me."

if [she could] pay attention." Juror No. 2 stated, "This—this whole morning, nothing register[ed] in my head. So I'm not sure if I can stay."

Upon the trial court's further inquiry, Juror No. 2 elaborated that her mother was watching her children while she was at court, but "the more important thing is [her] state of mind." The court explained, "Now, I anticipate that we are very close to concluding the evidence in the case, and the matter will be submitted. I also certainly understand that it's a trying time for you, but I need you to stay." The court reiterated, "I really—I need you to stay . . . [¶] . . . there's no getting around it. I thought two alternates was enough and I underestimated." The court then asked Juror No. 2 whether taking some time off would be helpful to her situation but Juror No. 2 declined, stating that if the trial were to finish by Thursday, she would "go on with it," and "try [her] best to stay focused." The court followed up with Juror No. 2 later that day, stating, "You seemed like you were having no problem paying attention and focusing. Is that—am I correct in that?" Juror No. 2 replied, "Yeah. I'll try to stay focused." Neither the district attorney nor Contreras's trial counsel had additional comments relating to Juror No. 2's self-reported inattentiveness, and neither sought to question Juror No. 2. Contreras's trial counsel did not object to Juror No. 2's continued service on the jury or move for mistrial.

The next morning, Contreras's trial counsel expressed concerns relating to Juror No. 2 for the first time: "I wanted to express my concern about Juror No. 2. I did not hear her say this, but my colleague indicated that he heard her say that she wasn't being attentive during [Contreras's] testimony. That's just a source of concern." The trial court replied, "I spent a fair amount of time voir diring her as to her ability to pay attention and—and checked in with her again at the end of the day. I feel confident that she has been and will continue to be a valid member of the jury. And I've asked her, as you know, to let me know if that's not the situation." Thereafter, counsel did not express dissatisfaction with Juror No. 2's service, did not object to her continued service, and did not move for mistrial.

7

**E.** *Closing, Verdict, New Trial Motion, and Sentencing*

One of the main defense theories at trial was that Doe fabricated the allegations of sexual abuse against Contreras because D.M. wanted to make Contreras "pay" for not getting back together with her. To dispel this theory, the prosecutor argued in closing: "If this was some grand plan by [D.M.], how could she plan on the pastor [asking] this question [whether Doe had been sexually abused]? What reason does the pastor have to lie? How could [D.M.] count on [Doe] to be a willing and convincing coconspirator? [¶] It's ridiculous. It's nonsense. It's BS . . . . [¶] The defense has proposed to you that this is a woman scorned. It's the first comments in opening argument. It's the second most antiquated and offensive argument, after 'she wanted it,' in a sexual assault case."

Trial counsel did not immediately object to the prosecutor's remarks but raised the issue with the court during the first intervening break, stating: "I do think it's improper to say what I—I said in the court . . . [was] 'BS.' I don't think that's proper, and I would like to see you indicate to [the district attorney] that that should stop, not to call what I said 'BS.' " The court agreed and admonished the prosecutor that "a different term would be a more appropriate reference in counsel's arguments."

After the jury found Contreras guilty on all charges, Contreras, with new counsel, moved for new trial based on (1) ineffective assistance of trial counsel, (2) Juror No. 2's inattention, and (3) the prosecutor's characterization of the defense theory as "BS" in the prosecutor's closing argument to the jury. Contreras contended that trial counsel was ineffective in failing to present potential defense witnesses: (1) a defense expert to either testify about confabulation or rebut Urquiza's testimony about CSAAS, and (2) the family's pastor to testify that Doe made the allegations of abuse when the pastor confronted Doe about his sexual orientation.

After hearing trial counsel's testimony, the trial court denied the motion. The court concluded it was "pure speculation" that retaining a defense expert to opine on confabulation would have resulted in a better outcome for Contreras. The court

8

concluded there was no basis to excuse Juror No. 2 or to grant a new trial based on any testimony the juror missed because the court "[did] not believe she missed any of the testimony." Finally, the court rejected Contreras's allegations of prosecutorial misconduct. The court sentenced Contreras to a term of 80 years to life and imposed (among other fines and fees) a $129.75 CJA fee.

Contreras timely appealed.

## II.    DISCUSSION

### A.    *The Juror Misconduct Claim is Forfeited*

Contreras contends the trial court abused its discretion by failing to remove Juror No. 2 for her self-reported inattention. Contreras acknowledges that trial counsel never sought Juror No. 2's removal or a mistrial based on the juror's self-reported inattention. Contreras argues that neither measure was necessary, positing that the trial court had a duty to remove the juror on its own motion, and alternatively, that any request for mistrial would have been futile. Neither argument has merit.

#### 1.    *Duty to Inquire Versus Duty to Discharge*

Once a juror is sworn, "great caution is required" before the juror may be removed. Once on notice of potential cause to remove a juror, the trial court has an independent duty to inquire into potential juror misconduct, "whether or not the defense requests an inquiry, and indeed . . . even if the defendant objects to such an inquiry." (See *People v. Cowan* (2010) 50 Cal.4th 401, 506; see also *People v. Johnsen* (2021) 10 Cal.5th 1116, 1169 (*Johnsen*).) Contreras acknowledges that the court here conducted an inquiry and does not dispute its adequacy. He instead contends that the court erred by failing to remove Juror No. 2 on its own motion because "the juror's inability to perform her duty was clear."

But while the duty to inquire into potential juror misconduct lies with the court, the duty to seek a juror's removal lies with the defendant. To preserve a claim of prejudicial juror misconduct, the defense must " 'propose additional questions [to be

9

asked of jurors], object to any juror's continued service, or request a mistrial on the ground of juror misconduct.' " (*Johnsen*, *supra*, 10 Cal.5th at pp. 1169–1170.) The requirement of a timely objection is no mere formality. Had Contreras requested the juror's removal " 'the court could have formally ruled on the matter . . . and cured the problem,' if any, by excusing the juror and substituting an alternate"—or here, where there were no alternates left, entertained Contreras's motion for mistrial. (*People v. Holloway* (2004) 33 Cal.4th 96, 124 (*Holloway*).)

After the trial court completed its inquiry into Juror No. 2's ability to serve, trial counsel neither sought further inquiry nor objected to Juror No. 2's continued service. And while counsel the next day "express[ed] [his] concern" about Juror No. 2's inattentiveness, counsel stopped short of any objection to the court's indication it was "confident that she has been and will continue to be a valid member of the jury." Counsel's identification of a concern—untethered from any request for reconsideration of the ruling, for further inquiry, or for a mistrial—is insufficient to preserve a claim of juror misconduct when "defense counsel thereafter expressed no dissatisfaction with the [court's] inquiry or with the jurors' continued service." (*People v. Foster* (2010) 50 Cal.4th 1301, 1341, fn. 17.) "Having expressed no desire to have the juror discharged at the time, and indeed no concern the juror had engaged in prejudicial misconduct, defendant 'is not privileged to make that argument now for the first time on appeal.' "[4] (*Holloway*, *supra*, 33 Cal.4th at p. 124; see also *Johnsen*, *supra*, 10 Cal.5th at p. 1170 [holding that by "failing to seek Juror Y.P.'s excusal or otherwise object to the court's

---

[4] Although it was in his new trial motion that Contreras first raised his claim of juror misconduct (§ 1181, subd. 3), he has not argued on appeal that the trial court abused its discretion in denying that motion. Instead, he maintains that the court erred in failing to excuse Juror No. 2 upon inquiry. We note that at the hearing on his new trial motion, Contreras called trial counsel to testify about the adequacy of his representation but did not examine counsel about his handling of Juror No. 2's disclosure.

10

course of action, [defendant] forfeited his claim that the court should have removed Juror Y.P."].)

By failing to seek further inquiry or removal of Juror No. 2, Contreras has forfeited this claim.

### 2. *Futility*

It is true that " '[r]eviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile . . . .' " (*People v. Brooks* (2017) 3 Cal.5th 1, 92.) But Contreras has not established the "unusual circumstances" that would support an inference of futility here. (Cf. *People v. Hill* (1998) 17 Cal.4th 800, 822 (*Hill*).)

In *Hill,* for example, the Supreme Court excused defense counsel's failure to object to prosecutorial misconduct, because counsel had repeatedly objected in vain to "continual" misconduct, but the trial court not only overruled the objections but chastised counsel in the jury's presence for being "obstructionist." (*Hill*, *supra*, 17 Cal.4th at p. 821.) In the "unusual circumstances" of this "poisonous" environment, counsel "could reasonably infer from the general tenor of the trial court's prior rulings and comments that it disfavored additional interruptions," and that further objection "would risk additional critical comments . . . that would suggest to the jury the trial court believed [counsel] was unnecessarily prolonging the proceedings by interposing 'meritless' objections." (*Id.* at pp. 821, 822; see also *People v. Zambrano* (2004) 124 Cal.App.4th 228, 237 [excusing failure to object to a line of cross-examination after the trial court had overruled objections to a similar line of questioning and argument].) By contrast, in *People v. Riel* (2000) 22 Cal.4th 1153 (*Riel*), the court applied "[t]he normal rule requiring an objection . . . , not the unusual one applied to the extreme circumstances of [*Hill*]," concluding the record presented no unusual circumstances: "The trial atmosphere was not poisonous, defense counsel did not object at all, and the record fails to suggest that any objections would have been futile. (*Riel*, at p. 1213.)

11

Contreras argues that an objection or request for mistrial here would have been futile because "[t]he trial court was going to make sure Juror No. 2 stayed seated because the alternative, a mistrial, was simply not an option the trial court was willing to consider." To be sure, the trial court's exchange with Juror No. 2 suggested its panic at the prospect of a mistrial. The court discounted Juror No. 2's own report that for a half-day of the defense case, "nothing register[ed] in my head," given her reported experience of domestic abuse, the arrest and release on bail of the alleged perpetrator, and her related struggle to provide appropriate care for her children. In urging the juror to "do [her] best to pay attention," the court invoked its own dilemma of having underestimated the need for alternates and emphasized its need to retain Juror No. 2.

But on this record we cannot conclude that a timely request for Juror No. 2's removal would have been futile. Indeed, the trial court's effort to rehabilitate the juror would seem to reflect its recognition that her answers mattered to its determination whether to excuse her. (And it acknowledged in entreating her to stay that it had not yet heard from counsel for the parties, signaling its awareness that counsel might prefer a different approach.) The court's readiness to retain the juror does not allow us to infer that it would have denied counsel an opportunity to inquire further or overruled a timely objection to the adequacy of the juror's commitment to "try her best." (Compare *Riel*, *supra*, 22 Cal.4th at p. 1213 [declining to apply futility exception when "defense counsel did not object at all"], with *Hill*, *supra*, 17 Cal.4th at pp. 821–822 [deeming further objection futile, after counsel had objected repeatedly to prior misconduct before yielding].) And unlike *Hill*, the record here does not betray a " 'poisonous' " trial atmosphere that would have deterred counsel from doing either. (See *Riel*, at p. 1212.)

There are thus no "unusual circumstances" in this case that warrant applying the futility exception to the forfeiture rule. We conclude that the juror misconduct claim is forfeited.

**B.** *No Abuse of Discretion in Admitting CSAAS Testimony*

Next, Contreras argues the trial court abused its discretion in admitting Urquiza's CSAAS testimony because the testimony was not relevant, unduly prejudicial, and unreliable under the *Kelly* rule.[5]  He contends that admission of the testimony violated his due process rights.  There was neither an abuse of discretion nor a constitutional violation.

**1.** *The Evidence was Relevant and Not Unduly Prejudicial*

California courts have long held expert testimony concerning CSAAS admissible " 'to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1301 (*McAlpin*); see also *People v. Bowker* (1988) 203 Cal.App.3d 385, 394 (*Bowker*) [limiting the permissible purpose to "showing that the victim's reactions . . . are not inconsistent with having been molested"].)

Although Contreras now disputes that "the public [still] holds the presumed misconceptions CSAAS purports to address," this is not the argument he made or substantiated in the trial court.  And " '[t]he jury need not be *wholly* ignorant of the subject matter of the opinion' " for a trial court to reasonably conclude that Urquiza's expert testimony regarding delayed disclosure, victim demeanor, and inconsistencies in the victim's testimony would still assist the jury as Evidence Code section 801 contemplates.  (*McAlpin*, *supra*, 53 Cal.3d at p. 1299, italics added.)

Contreras next argues that CSAAS evidence was not relevant in his case because Doe did not recant.  But recantation (or retraction) was only one facet of Urquiza's

---

[5] "Formerly known as the *Kelly-Frye* rule, based on *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) and *Frye v. U.S.* (D.C. Cir. 1923) 293 F. 1013, the rule is now the *Kelly* rule in California after changes to the Federal Rules of Evidence that superseded *Frye*." (*People v. Nieves* (2021) 11 Cal.5th 404, 442, fn. 8.)

CSAAS testimony. Urquiza testified about the common occurrence of "delayed and unconvincing disclosure," which was central to Contreras's challenge to Doe's credibility. During Doe's testimony, the defense cross-examined Doe extensively on how his account of the abuse evolved and accused Doe of lying due to his prior inconsistent and incomplete statements. In closing argument, counsel emphasized how Doe in his recorded police interview neither cried nor showed "emotional attachment to his description" of the sexual abuse, and suggested that Doe must therefore be lying. Counsel also argued that inconsistencies in Doe's account of the sexual abuse made it the likely "confabulation" of "false memory." Urquiza's testimony, which discussed commonly held misconceptions involving delayed reporting, inconsistent, incremental, and unconvincing disclosure, and abuse victim demeanor, provided the jury with an alternative framework through which to assess Doe's testimony and to interpret Doe's "seemingly self-impeaching" behavior at trial. (*McAlpin*, *supra*, 53 Cal.3d at p. 1301.)

Nor has Contreras demonstrated any abuse of discretion in not excluding Urquiza's testimony under Evidence Code section 352. Contreras argues the testimony was unduly prejudicial because of the "likelihood the jury will misuse it as a diagnostic tool to determine if the complaining witness[] has been molested." But Urquiza made clear that CSAAS testimony is "not diagnostic" but a syndrome of "just things that tend to co-occur" but "don't point to a specific etiology." The court further instructed the jury (both after Urquiza's testimony and at the end of the case) that the CSAAS testimony "is not evidence that the defendant committed any of the crimes charged against [Doe]."[6] Contreras offers nothing that would overcome our typical presumption that the jury followed this instruction. (See *People v. Cain* (1995) 10 Cal.4th 1, 34.)

The trial court did not abuse its discretion in admitting this evidence.

---

[6] We address Contreras's claim of instructional error relating to this jury instruction in the next section.

## 2. *The* **Kelly** *Rule Did Not Apply*

Finally, Contreras argues that Urquiza's CSAAS testimony was inadmissible because it had not been deemed reliable under *Kelly*, *supra*, 17 Cal.3d at p. 30. Under the *Kelly* rule, the admissibility of evidence derived from a new scientific method or test yielding a specific conclusion or result depends on the reliability of the method (as evidenced by its general acceptance in the relevant scientific community), as well as the qualifications of the expert opining on the subject and the application of correct procedures. (See *ibid*.) But *Kelly* " 'only applies to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 316; *People v. Peterson* (2020) 10 Cal.5th 409, 457.) Expert testimony based on a new scientific theory or on a "novel technique" designed to provide "some definitive truth" warrants the "additional scrutiny" that *Kelly* provides. (See *Peterson*, at pp. 457–458.)

The CSAAS evidence admitted here is not new. (See *Bowker*, *supra*, 203 Cal.App.3d at p. 389, fn. 3 [CSAAS dates back to at least 1983].) Nor did Urquiza purport to provide a definitive truth that would require *Kelly* scrutiny; Urquiza expressly disclaimed any such intent. Rather, his CSAAS testimony was limited to countering potential misconceptions about how children who have been sexually abused would react and report. (See *McAlpin*, *supra*, 53 Cal.3d at p. 1301.) It was therefore not "scientific evidence" subject to the *Kelly* rule. (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 173 (*Lapenias*) [*Kelly* rule does not apply to CSAAS evidence]; *People v. Munch (2020)* 52 Cal.App.5th 464, 472–473 (*Munch*) [accord].)[7]

---

[7] Having rejected each of the underlying claims of error in admitting CSAAS evidence, we accordingly reject Contreras's due process claim. (*People v. Scott* (2011) 52 Cal.4th 452, 487, fn. 29 [noting that "rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or 'gloss' raised [on appeal]"].)

15

## C.     *CALCRIM No. 1193*

Contreras next argues that CALCRIM No. 1193 erroneously permits the jury to consider CSAAS testimony in determining Doe's credibility, and in doing so, lessens the prosecutor's burden of proof.[8]  The trial court here instructed the jury:  "Dr. Urquiza's testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him.  [¶]  You may consider this evidence only in deciding whether or not . . . Doe's conduct was not inconsistent with the conduct of someone who has been molested *and evaluating the believability of his testimony.*"  (Italics added.)

We review a claim of instructional error de novo.  (*Lapenias*, *supra*, 67 Cal.App.5th at p. 175.)  "The challenged instruction is considered 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' "  (*People v. Rivera* (2019) 7 Cal.5th 306, 326 (*Rivera*).)

Multiple Courts of Appeal have upheld the language of CALCRIM No. 1193, as recited above, as accurately informing the jury of the limited use of CSAAS evidence.  (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 503–504; *Munch*, *supra*, 52 Cal.App.5th at pp. 473–474; *Lapenias*, *supra*, 67 Cal.App.5th at pp. 175–176.)  Moreover, assuming without deciding that the reference to believability as a distinct purpose in the last sentence of the instruction may create some ambiguity, we consider it unlikely that the jury here would have applied the instruction in an impermissible manner.  (See *Rivera*, *supra*, 7 Cal.5th at p. 326.)  Urquiza's testimony was appropriately limited—he did not render an opinion on whether Doe was molested, and indeed, went out of his way to clarify that CSAAS evidence is not "diagnostic," cannot be used to determine whether a child was abused, and that "[t]he responsibility for determining whether somebody was

---

[8] We reach the merits of this claim despite Contreras's failure to object in the trial court.  (§ 1259.)  The claim in essence is that the instruction is not " 'correct in law' " and affected his substantial rights.  (*People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7.)

abused or not or whether somebody was a perpetrator or not is [the] responsibility of a jury." Nor did the prosecutor argue improper inferences from Urquiza's testimony. And CALCRIM No. 1193 further informs the jury that CSAAS evidence "is not evidence that the defendant committed any of the crimes charged."

On this record, we find no merit to Contreras's assertion that the reference to the "believability of the witnesses" in CALCRIM No. 1193 would have led the jury to believe it was free to use the CSAAS evidence to "diagnose" Doe with having been abused—rather than to intelligently decide whether Doe's behavior was self-impeaching. We reject Contreras's claim that the instruction impermissibly lowered the prosecutor's burden of proof.

## D. *Prosecutorial Misconduct and Ineffective Assistance of Trial Counsel*

Contreras argues that the prosecutor committed prejudicial misconduct in closing argument by launching a "vitriolic attack" on Contreras's trial counsel. What Contreras on appeal identifies as misconduct are the prosecutor's characterization of defense theories as "ridiculous," "nonsense," "BS," and "antiquated and offensive." Although trial counsel did not immediately object and arguably forfeited this claim,[9] we address the merits, given Contreras's additional argument that counsel was constitutionally ineffective for failing to preserve the issue. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1125–1126.) While we do not condone the intemperance of the comments Contreras has identified, we do not find these rose to the level of prosecutorial misconduct.

---

[9] While it is true that counsel did not object at the time of the remark, counsel raised the issue with the trial court at first opportunity outside the presence of the jury and asked the court to admonish the prosecutor "not to call what I said 'BS.' " The court obliged and admonished the prosecutor to use a different term.

17

### 1.    *Attacking Defense Theory versus Attacking Defense Counsel*

During closing argument, the prosecutor ridiculed Contreras's theory that Doe fabricated the sexual abuse allegations against Contreras at his mother's behest as payback for Contreras's rejection of her:  "If this was some grand plan by [D.M.], how could she plan on the pastor [asking]this question [regarding whether Doe had been sexually abused]?  What reason does the pastor have to lie?  How could [D.M.] count on [Doe] to be a willing and convincing coconspirator?  [¶]  It's ridiculous.  It's nonsense. It's BS.  . . .  [¶]  The defense has proposed to you that this is a woman scorned.  It's the first comments in opening argument.  It's the second most antiquated and offensive argument, after 'she wanted it,' in a sexual assault case."

A prosecutor " ' " 'is given wide latitude during argument' " ' " and may " ' "vigorously argue [the People's] case" ' " without being " ' "limited to 'Chesterfieldian politeness.' " ' " (*Hill*, *supra*, 17 Cal.4th 819.)  " 'It is, of course, improper for the prosecutor "to imply that defense counsel has fabricated evidence or otherwise to portray defense counsel as the villain in the case.  . . .  Casting uncalled for aspersions on defense counsel directs attention to largely irrelevant matters and does not constitute comment on the evidence or argument as to inferences to be drawn therefrom." ' " (*People v. Redd* (2010) 48 Cal.4th 691, 749.)  Yet our high court has discerned no error in closing argument that "challenges the insinuations—not the character—of defense counsel." (See *People v. Lewis* (2009) 46 Cal.4th 1255, 1305 [finding no misconduct in prosecutor's argument that defense counsel's " 'insinuations are false, and all they can do possibly is mislead you' "].)  Here, the prosecutor's remarks were tethered to the evidence and represented an attack on defense theory, not defense counsel's integrity.  (See *Redd*, at p. 749 [calling defense theory "ridiculous" and "preposterous" is not misconduct].)  The remarks did not rise to the level of the denigration of counsel as the Supreme Court has defined it.

## 2. *Trial Counsel's Failure to Object*

Contreras relatedly argues he was denied his constitutional right to effective assistance of counsel because trial counsel failed to object to the prosecutor's "BS" and "antiquated" remarks. Initially, because we have concluded that the prosecutor did not engage in misconduct, counsel cannot be said to have rendered deficient performance by failing to object to that non-misconduct. But even if the identified arguments were objectionable, "ineffective assistance of counsel will be found [on direct appeal] only if the record affirmatively demonstrates trial counsel had no rational tactical purpose for the challenged act or omission." (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 226.) Here, it is plausible that counsel calculated that objecting to the prosecutor's remarks would at best give the prosecutor an excuse to reiterate the same substantive points in only marginally moderated form, calling attention to the defense failure to substantiate its various theories of Doe's motive to lie. Counsel may also have calculated that a curative instruction was unnecessary for the jury to recognize and discount the prosecutor's rhetorical excess. " '[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' " (*People v. Harris* (2008) 43 Cal.4th 1269, 1290.) It does not do so here.

## III.  DISPOSITION

The judgment is modified to vacate any portion of the criminal justice administration fee that remained unpaid as of July 1, 2021. The trial court is directed to prepare an amended abstract of judgment reflecting the modification and transmit it to the California Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

19

_____
LIE, Acting P. J.

WE CONCUR:


_____
WILSON, J.


_____
BROMBERG, J.


*People v. Contreras*
H048703